## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN H. RAY, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROPES & GRAY LLP, DAVID C. CHAPIN, | ) | |
| JOHN D. DONOVAN, JR., KEITH F. HIGGINS, | ) | |
| JESSE J. JENNER, WILLIAM A. KNOWLTON, | ) | CIV. A. NO.: _____ |
| BRADFORD R. MALT, JOAN MCPHEE, | ) | |
| JOHN T. MONTGOMERY, OTHON A. | ) | |
| PROUNIS, DAVID M. MANDEL, ROBERT G. | ) | |
| JONES, RANDALL W. BODNER, BRIEN T. | ) | |
| O'CONNOR and JOY U. CURTIS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff, John H. Ray, III ("Ray"), for his cause of action against defendants,

Ropes & Gray LLP ("Ropes & Gray," "Ropes" or the "firm"), David C. Chapin, John D.

Donovan, Jr., Keith F. Higgins, Jesse J. Jenner, William A. Knowlton, Bradford R. Malt, Joan

McPhee, John T. Montgomery, Othon A. Prounis, David M. Mandel, Robert G. Jones, Randall

W. Bodner, Brien T. O'Connor and Joy U. Curtis (collectively, "Defendants"), states as follows:

## INTRODUCTION

1.     On February 22, 2011, the United States Equal Employment Opportunity

Commission ("EEOC") issued a final determination that Ropes & Gray violated the civil rights

laws, specifically that "[t]he evidence supports a finding that [Ropes & Gray] retaliated against

[Ray] for filing his charge with the EEOC." (*See* Exhibit 1, at 1.)

2.     Its violations are ongoing.

3.     Ropes and its partners have refused to stop the retaliation.

4.     They have merely disregarded the EEOC and its process as "nonsense," without any justification, other than conclusory claims that they did not violate the law, in spite of the evidence and ample opportunity to demonstrate any legitimate excuse.

5.     The message has been clear:  Ropes & Gray will not treat blacks fairly and equally under the law, nor allow them the protections of the civil rights laws, not when demanded by the EEOC, or required under law.

6.     Ropes' and its partners' refusal to cooperate or make any effort to come to a reasonable resolution, have forced this action.

7.     Ropes & Gray's "culture" of dogged disrespect for the civil rights laws and defiance of enforcement by federal agencies is representative of the serious racial prejudice that has prevented the recruitment and advancement of blacks, and Ray in particular, at the firm.

8.     Indeed, Ray was accepted to Harvard Law School at age 19.

9.     He was invited to join the *Harvard Law Review* at the end of his first year.

10.    After graduating from Harvard Law School, he clerked in the United States Court of Appeals for the Seventh Circuit.

11.    Then, he worked at Cravath, Swaine & Moore LLP and Jenner & Block, LLP, with solid praise and recommendations from their senior partners.

12.    In spite of his accomplishments, at Ropes & Gray, he was treated as a "token black associate," his accomplishments met with suspicion, and perceived by too many as merely a "diversity hire," stereotyped in many ways to the same effect, that he was just a "nigger," who did not fit with the predominantly white "culture" at Ropes.

13.     As an eighth year senior associate, he was expressly asked by a Ropes partner to be the "token black associate" and "black face" to sit at the table in defending a large prospective bank client facing allegations of mortgage redlining against black residents of Dorchester, a black community in Boston.

14.     When he raised opposition to this "culture," the "token black associate" comment, a "nigger" joke, all by partners, and other issues, Ropes and its partners retaliated.

15.     They denied Ray work, locked him out of the office, refused to serve as references or provide letters of recommendation that they had agreed to provide, and generally attempted to discredit him and destroy his career — all in violation of the law.

16.     Ray went to the EEOC.

17.     But the firm lied about its conduct, concealed documents and attempted to deceive the EEOC, and obstruct any fair and full investigation of its conduct, among other things, claiming to lack any knowledge of the retaliation.

18.     And for a brief period, it worked.

19.     After senior EEOC officials reviewed the retaliation evidence again, however, it was clear that Ropes had violated the law — a final decision the EEOC has consistently refused to reverse, based on evidence Ropes has never disputed.

20.     The EEOC also rescinded its earlier factual findings, and issued a final determination with only legal findings, as Ropes and its partners had substantially lied to the EEOC and lied in the face of written evidence that their statements were knowingly and demonstrably false. (*See* Exhibit 2, at 1; Exhibit 1.)

21.    For his efforts to deceive the EEOC, Ropes partner David Mandel has subjected himself to Massachusetts Board of Bar Overseers investigation and potential disciplinary sanctions.

22.    But Ropes and its partners still refuse to follow the law.

23.    Ropes has made clear that it has no intent on stopping or providing any legitimate justification (in the face of repeated requests), as its defiance serves as a lesson to other blacks that Ropes and its partners have the power to disregard the law, the EEOC and even the courts for years, and it will abuse that power to protect its "culture."

24.    This discriminatory, retaliatory and dishonest "culture" has wrongfully denied Ray partnership and the opportunity to advance his career, causing irreparable and substantial injury and harm.

## PARTIES

25.    Ray is an individual, residing in Massachusetts.  Ray is black.

26.    Ropes & Gray LLP is a limited liability partnership with its principal place of business located at Prudential Tower, 800 Boylston Street, Boston, MA 02199.

27.    David C. Chapin ("Chapin") is an individual, residing in Massachusetts.  Chapin is white.  He is a partner and was a member of the Ropes & Gray Policy Committee during the relevant time period.

28.    John D. Donovan, Jr. ("Donovan") is an individual, residing in Massachusetts.  Donovan is white.  He is a partner and was a member of the Ropes & Gray Policy Committee during the relevant time period.

29.     Keith F. Higgins ("Higgins") is an individual, residing in Massachusetts. Higgins is white. He is a partner and was a member of the Ropes & Gray Policy Committee during the relevant time period.

30.     Jesse J. Jenner ("Jenner") is an individual, residing in New York. Jenner is white. He is a partner and was a member of the Ropes & Gray Policy Committee during the relevant time period, and transacts business in Massachusetts.

31.     William A. Knowlton ("Knowlton") is an individual, residing in Massachusetts. Knowlton is white. He is a partner and was a member of the Ropes & Gray Policy Committee during the relevant time period.

32.     Bradford R. Malt ("Malt") is an individual, residing in Massachusetts. He is white. He is a partner and was a member of the Ropes & Gray Policy Committee during the relevant time period.

33.     Joan McPhee ("McPhee") is an individual, residing in Rhode Island. McPhee is white. She is a partner and was a member of the Ropes & Gray Policy Committee during the relevant time period, and transacts business in Massachusetts.

34.     John T. Montgomery ("Montgomery") is an individual, residing in Massachusetts. Montgomery is white. He is a partner and was a member of the Ropes & Gray Policy Committee and Managing Partner of the firm during the relevant time period.

35.     Othon A. Prounis ("Prounis") is an individual, residing in New York. Prounis is white. He is a partner and was a member of the Ropes & Gray Policy Committee during the relevant time period, and transacts business in Massachusetts.

36.     David M. Mandel ("Mandel") is an individual, residing in Massachusetts. Mandel is white. Mandel is a partner at Ropes.

37.     Robert G. Jones ("Jones") is an individual, residing in Massachusetts. Jones is white. He is a partner and was the work assignment partner for the Litigation Department at Ropes & Gray during part of the relevant time period.

38.     Randall W. Bodner ("Bodner") is an individual, residing in Massachusetts. Bodner is white. Bodner is a partner at Ropes.

39.     Brien T. O'Connor ("O'Connor") is an individual, residing in Massachusetts. O'Connor is white. O'Connor is a partner at Ropes.

40.     Joy U. Curtis ("Curtis") is an individual, residing in Massachusetts. Curtis is white. She was the Chief People Officer at Ropes & Gray during the relevant time period.

## JURISDICTION AND VENUE

41.     This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 and 2000e-3, M.G.L c. 93, Section 102, M.G.L. c. 151B, Section 4, M.G.L. c. 93a, Section 11, and Massachusetts common law.

42.     This Court has original jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. §§ 1331 and 1343.

43.     A charge concerning the discrimination and retaliation was timely filed with the EEOC and the Massachusetts Commission Against Discrimination ("MCAD"), and on May 5, 2011, the EEOC issued a right to sue letter concerning those claims.

44.     This action was commenced within 90 days of the date of receipt of that letter.

45.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

46.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, insofar as a

substantial part of the events, the discrimination and retaliation, and other misconduct, giving

rise to this action occurred within this District.

## FACTS

**I.     ROPES & GRAY DISCRIMINATES AGAINST BLACKS, APPLYING A
        HIGHER STANDARD OF "QUALIFIED," AND DISCRIMINATED AGAINST
        RAY IN PARTICULAR IN HIS PARTNERSHIP CONSIDERATION,
        DEMANDING HE SERVE AS A "TOKEN BLACK ASSOCIATE."**

   ***A.    Ropes & Gray Labels Its Black Associates As "Diversity Hires" And Privately,
           as "Tokens," Fostering A Culture That Identifies Them as "Unqualified,"
           Among Other Racial Stereotypes.***

47.     Prior to joining (and after leaving) Ropes & Gray, Ray demonstrated a substantial

level of knowledge, expertise, and skill as a securities and complex corporate litigation attorney,

as well as in several other areas of the practice of law.

48.     Ray was accepted to Harvard Law School at age 19.

49.     He was invited to join the *Harvard Law Review* at the end of his first year.

50.     He wrote and published two pieces for that journal.

51.     After graduating from Harvard Law School, he clerked in the United States Court

of Appeals for the Seventh Circuit.

52.     He worked at Cravath, Swaine & Moore LLP and Jenner & Block, LLP, with

solid praise and recommendations from their senior partners.

53.     His experience was extensive at his level:

While at Cravath, most notably, Ray drafted an appeal on the ineffectiveness of trial
counsel on behalf of a death row inmate in Alabama; her sentence was reversed on those
grounds. In addition, Ray spent years working on complex securities fraud litigation, as
well as on a corporate fraud and Racketeer Influenced and Corrupt Organizations Act
action ("RICO"), where he received praise and valuable securities and complex corporate
litigation experience. He also successfully second-chaired an employment dispute tried
in arbitration. At Jenner, among other accomplishments, Ray successfully second-
chaired a complex products liability trial in the Cook County Circuit Court, cross-

examining fact and expert witnesses at trial — and forcing one expert to recant his testimony. Ray also drafted and successfully argued an appeal on behalf of a *pro bono* client in a civil rights case before the Seventh Circuit.

54.     Senior partners at both firms have not hesitated to provide references and strong letters of recommendation on his behalf for his work at those firms.

55.     By the time he left Ropes & Gray, his work experience and resume at that time reflected a career that even Ropes & Gray partners have acknowledged as "impressive." (*See* Exhibit 3.)

56.     Ray, however, is black.

57.     And Ropes & Gray has had an extremely poor record for diversity among blacks, and a disparate standard for their qualifications and value to the firm.

58.     In the last 30 years, Ropes has only made 1 black associate a partner, of the several hundred partners during that period, almost all white.

59.     At the time Ray was employed, Ropes employed only 6 black associates in the Boston office (of approximately 390 associates in that office total).

60.     As to those 6 — 5 graduated from Harvard Law School (including Ray), and the 6th from Yale.

61.     A different standard applied to whites.

62.     Among the white associates, Ropes had a more diverse view of "qualified."

63.     The vast majority did not attend Harvard or Yale.

64.     Moreover, at that time, in diversity rankings for black associates in Boston, Ropes ranked not 2nd or 3rd … but 17th among Boston law firms. (*See* Exhibit 4.)

65.     Ropes' record in this regard was so poor that it ranked only 3 firms above those firms in Boston that had no black associates at all, and 9th of the top 10 most prestigious firms in Boston on this diversity measure. (*Id.*)

66.     Since then, Ropes' record has not improved.

67.     It is a reflection of the perception among Ropes partners and stated to its

associates that blacks are "diversity hires," and in private, merely, "token black associates" for

the firm.

68.     One partner in the firm made clear that the black candidates simply did not appear

to Ropes "qualified," in spite of being hired by and succeeding at other comparable and more

prestigious firms.

### B.     *Ropes & Gray Actively Recruited Ray Because Of His Knowledge, Experience And Skill, Promising Serious Consideration For Partner, Regardless of Race.*

69.     In January 2005, Ray decided to move to Boston for his then-fiancée, and

interviewed at several firms and received offers from them all, including Ropes & Gray.

70.     In recruiting Ray to accept its offer (over offers from Skadden, Arps, Meager,

Slate & Flom LLP, Goodwin Proctor LLP, Foley Hoag LLP, Greenberg Traurig LLP and Robins

Kaplan Miller & Ciresi LLP — all top firms in Boston and the nation), Ropes marketed its

diversity efforts, its benchmark hours requirement, the opportunity to work on challenging and

complex legal work, and real consideration for partner in the firm.

71.     Ray accepted Ropes' offer, declining the others.

72.     As part of its revised policy manual at that time, Ropes stated that "Ropes & Gray

has ... a policy of equal employment opportunity in all its employment practices and ... there

shall be no unlawful discrimination against any employee or applicant for employment on

grounds of race [or] color ...."

73.     Furthermore, the policy stated that in "training, compensation, benefits, ... job

classification, assignment, working conditions, promotions, transfers, termination,

reemployment, ... employee treatment, and all other terms, conditions and privileges of employment" "[a]ll employment decisions are to be made on a nondiscriminatory basis."

74.     In addition, Rule 8 of the Massachusetts Rules of Professional Conduct, to which all Boston partners were subject, states that "[i]t is professional misconduct for a lawyer to: ... (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice; ... (h) engage in any other conduct that adversely reflects on his or her fitness to practice law."

75.     In accepting the offer to join Ropes & Gray, Ray accepted Roscoe Trimmier's assurances that Ropes "does not see black and white, only shades of Ropes & Gray."

76.     Ropes and its partners did not live up to these promises, or principles, however.

C.     *Ropes & Gray And Its Partners Discriminated Against Ray, Treating Him Disparately From His White Counterparts, and Retaliating in 2008 For His Objection To "Token Black Associate" Comments And "Nigger" Jokes.*

77.     In 2008, Ray was in his eighth year at Ropes & Gray, meeting the legitimate expectations of the firm, and under serious considered for partner, or counsel, positions for which he was qualified.

78.     Ray was as equally qualified as comparable white associates who had made partner or counsel in the firm, in or around the years he was under consideration.

79.     Prior to 2008, Ray had received substantial praise for his work at the firm, and had continually advanced year after year as a senior associate, receiving substantial and prominent work assignments to demonstrate his leadership and skill.

80.     At every opportunity, Ray had taken on significant responsibility and demonstrated his ability as a partnership candidate; for instance:

> He drafted several motions for summary judgment and managed litigation in several states for a large pharmaceutical manufacturer client alleged to have engaged in a fraudulent pricing scheme along with other drug manufacturers. He received praise from

Brien O'Connor, the lead partner on the cases, as well as from co-counsel. Ray also managed a breach of contract lawsuit on behalf of a corporate client and negotiated a settlement that prompted the partner, O'Connor to remark:

> Roscoe and Lisa,
>
> It is not all that often that I see words of thanks like these at the end of a matter. This is one for which John Ray did virtually all of the work (opposite Duane Morris) and deserves 100% of the praise. The case required John to demonstrate a wide range of skillls [sic] and judgment. He needed to be tough at times and show patience and an ability to walk the client thorugh [sic] frustrating times at others. He handled all of it exceptionally well.

The email from the client read:

> I wanted to thank you both on my and [our] behalf for the exceptional manner in which you and your firm handled the referenced matter.
>
> Your quick and complete grasp of the situation, your ability to maintain an objective focus in moving toward a just solution, and your very good guidance during the journey were greatly appreciated and admired. John, I especially like your sense of humor. I sincerely appreciate your willingness to have taken on this matter as it most likely did not fit into your normal type of case but I hope you know how critically important it was to [us]. [We are] eternally grateful.

And when Ken Lay, former Enron Chairman and CEO was convicted on criminal charges for his role in the Enron scandal, he retained Samuel Buffone, a Ropes & Gray partner in the Washington, D.C. office. Ray was selected to lead the team of associates to represent Mr. Lay, for one of the most public clients in one the most complicated and leading legal cases for the firm. Ray represented Mr. Lay and his estate (following his death) against a number of complex legal challenges from the Department of Justice and private plaintiffs, drafting and filing briefs in opposition to various motions and petitions in the Southern District of Texas, the Fifth Circuit and the Supreme Court, from the summer of 2006 through the spring of 2007. Buffone repeatedly complimented Ray for his work.

With Randall Bodner, Ray represented a significant corporate client in one of the most public options backdating securities fraud cases (as the company was profiled for this conduct in the Wall Street Journal), from 2006 through 2009. Ray managed the entire civil litigation, securing a stay and later voluntary dismissal of a federal derivative action, the dismissal after a successful motion to dismiss of a state derivative action, the voluntary dismissal of two state derivative actions, and the settlement of the federal securities class action. While the motion to dismiss the federal securities class action was granted in part and denied in part, Ray drafted such a strong defense not only was he praised by Bodner ("great work everyone and great effort captained by John"), but also by counsel for co-defendants, senior partner Thomas Dougherty, of Skadden, Arps, Meager, Slate & Flom LLP, for having done a "Super job."

Working with Rick Marshall and Eva Carman, Ray led the associate team representing a private individual client in one of the largest market timing cases by the Securities and Exchange Commission ("SEC"). In addition to his work preparing the case for trial, including managing the review and collection of one of the largest document productions ever made available by the SEC, Ray drafted the briefs opposing the government's attempt to seek an interlocutory appeal to the SEC Commissioners regarding the scope of discovery. For his work, Ray received effusive praise from Marshall and Carman — "[t]his is an excellent brief."

> i. **By 2008, Ray had significantly positive reviews that demonstrated that he was "on the partnership track," meeting the expectations of the firm and was under serious consideration for partner.**

81.     At the end of 2007, Ray had significantly positive reviews.

82.     In leading the team to represent Kenneth Lay, former Enron CEO, an important

and high profile case for the firm, Buffone stated:

> He worked on the Ken Lay representation as coordinating lawyer. Impressed with his ability. He kept everyone informed and demonstrated the case management skills you hope to see. Drafting and legal analysis were not exceptional but very good. Buffone would say he is on the partnership track.

83.     For his work in leading the team for one of the firms' largest securities class and

derivative actions, Bodner stated:

> Worked a lot with him. Positive experience with him. Brooks Automation – senior associate. Got up to speed quickly. Good writer. Tireless worker. If going to battle, want him on his wing.

84.     The only limited comments for which some partners expressed room for growth,

were not substance, but subjective claims about fit within the Ropes "culture" — a virtually all

white culture, that viewed blacks as "diversity hires" and "tokens."

85.     For example, Lisa Ropple stated:

> Lateral from Cravath/Jenner & Block. Some people adore him; others say he needs softening around the edges. Can be hierarchical, but willing to learn and does learn. Needs to learn to help associates and train them. Wants to be a partner.

86.    Likewise, Steven Baughman complimented Ray, only raising potential cultural

concerns:

> Very strong analysis. Good writing. Very good at coming to a view on a thing.
> May have had challenges in working with other associates. Room for growth for
> in the future. Should cushion his messages a bit.

87.    Those generic, and often unsubstantiated, claims were common within the firm,

but as applied to Ray, no associate had reported any concerns; to the contrary, Ray had solid

relationships with the associates on his teams, a number of whom are still friends, have come to

his home and keep in contact with him.

88.    Associates, however, had ample opportunity to complain, as Ropes & Gray

conducted upward evaluations of all partners and senior associates in the firm in 2008, including

Ray, providing any junior associate the chance to raise any cultural or other concerns.

89.    Ray did not receive an evaluation, as fewer than three associates responded —

clearly showing that there were in fact no substantial numbers of associates with negative

comments or concerns.

90.    In his 2007 evaluation, the few negative criticisms were from partners who had

engaged in disparate treatment, and were in almost all instances knowingly, materially false and

misleading, and substantially inconsistent with the vast majority of his evaluations, appearing no

more than racial stereotyping and animus.

91.    For instance, Loretta Richard, a tax partner, worked with Ray on tax litigation in

2006 (not 2007), but nonetheless commented in 2007.

92.    Because of the complexity of the tax issues and the substantial work required for

several related tax challenges for the client, Ray requested a litigation associate to help work on

the matter.

93.    Richard refused.

94.     When a senior white associate was later assigned to the matter, however, after Ray transitioned away to other work, Richard did allow a mid-level litigation associate to help.

95.     Richard criticized Ray, however, for not working hard enough (indeed, as hard as both a senior and mid-level associate), in contrast to Bodner and others who described him as a "[t]ireless worker."

96.     Ray raised the disparity of support provided to him, in his evaluation review to David Mandel, and the unequal standard.

97.     The firm, in considering his year-end evaluation (in 2006, when he actually worked for Richard), largely dismissed Richard as an aberration.

98.     But Richard continued to criticize Ray in reviews, well after she had any contact with him, to deflect attention from her disparate treatment and unlawful discrimination against him, among other misconduct.

99.     And while Robert Jones claimed that Ray "did not step to his role," and supposedly "[w]aited for others to work in rather than recognizing gap and filing it," his evaluation was dramatically inconsistent with the circumstances he and Lisa Ropple, who was the Co-Head of the Litigation Department, approved — which Jones omitted.

100.    Indeed, Jones himself expressly agreed that Ray should reduce his work on Jones' case, because Ray had three other cases that were potentially going to trial, and Jones case' was likely going to settle (which it did).

101.    Moreover, Jones' comments stood starkly in contrast to almost every partner who worked with Ray, who had expressed his commitment as a "[t]ireless worker."

102.    In this absence of any legitimate basis for his claims, Jones' criticism appeared more based on his own prejudice and racial preference (which he later revealed), and a pervasive

- 14 -

culture in the firm that blacks were "diversity hires" and "token black associates," a theme that only increased in 2008.

ii.     **In 2008, Ropes demanded Ray serve as a "token black associate," and "black face," and retaliated against Ray for his opposition to unequal treatment, discrimination and retaliation.**

103.    In late 2007, Washington Mutual had been sued in a putative class action on behalf of "black homeowners ... for the discriminatory effects of the [their] home financing policies and practices." *Jones v. Long Beach Mortgage Co., et al.*, No. 09-CV-11372 (NMG) (D. Mass.) ("*Long Beach Mortgage*").

104.    That action was voluntarily dismissed within months based on an injunction against the proposed lead plaintiff, and Washington Mutual did not enter an appearance.

105.    Washington Mutual, however, searched for Boston counsel.

106.    The case was refiled on February 15, 2008.

107.    In early 2008, Robert Skinner, a partner in the Litigation Department, entered Ray's office, closed the door and explained that the firm wanted to compete for the discrimination case against Washington Mutual and its affiliates, to build a new relationship.

108.    Skinner explained that Washington Mutual and its various loan affiliates were alleged to have discriminated against blacks who applied for home mortgage loans in Dorchester, Massachusetts (a predominately black neighborhood) by adding arbitrarily extra non-credit based percentage points to their interest rates.

109.    Skinner said that it was important for the firm to be able to present a "black face" to Washington Mutual as part of the litigation team.

110.    Skinner said that he wanted to be clear, while Ray would have some responsibility, he would be a "token black associate" for the team and largely "sit there and smile."

111.   Ray requested a substantive role if he were to be part of the team, to which Skinner responded, "we'll see."

112.   Ropes was not retained as counsel, however.

113.   Among the team of attorneys Washington Mutual subsequently hired at KL Gates, none was black.

114.   It was clear that selling Ray as a "black face" to sit at the table and somehow by the color of his skin discredit the evidence was a Ropes & Gray idea, and representative of the firm's view of blacks.

115.   It was the only plan the firm had for him as a partner.

116.   Ray was not recruited for any other business development that year.

117.   Comparable white associates were not required nor asked to sit for race-baiting "token" projects in their consideration for partner.

118.   That was not the only incident early that year, however.

119.   In March 2008, Bodner had even made a "nigger" joke during a break in a mediation session, telling a story of a former mafia trial witness who had neglected to tell Bodner of a prior murder he had committed, that he had "beat a nigger to death who had tried to steal his car in New Jersey."

120.   Bodner laughed as he told his "nigger" joke to other whites.

121.   These "culture" problems were prevalent among the associate class as well.

122.   For instance, in the beginning of May 2008, Ropes & Gray released its annual summer associate directory.

123.   Ray was again disappointed because, in spite of its repeated claims that it promoted a diverse work environment and that Ray would not find himself among only a handful

of black associates within the firm, the 2008 summer class, like the last several summer classes, was again devoid of but a few black associates.

124.   Among 182 summer associates (in Boston, New York, Washington, D.C., and Palo Alto), only 4 were black.

125.   Ray began raising this wide and continued disparity in the partners and associates at Ropes & Gray to partners, and others at the firm.

126.   But it was not well received by the firm "culture."

127.   In one exchange, after noting this glaring disparity, a mid-level white associate responded, "but ... you don't believe in affirmative action," reflecting an often stated view by partners that few blacks were "qualified" in spite of their accomplishments and success at other comparable and more prestigious firms.

> ### iii.   In response to his complaints, Ropes never conducted any investigation of his claims, but instead retaliated against Ray and attempted to discredit him with false accusations and claims.

128.   Ray raised these "cultural" concerns to partners and others in the firm, particularly the "token black associate" comments, the "nigger" joke, and the "affirmative action" and "diversity hires" view, which seemed to occur more and more in 2008.

129.   After these complaints, everything changed.

130.   In response, partners, including Trimmier and Ropple, questioned whether Ray was a "team player" and wanted to be a partner in the firm.

131.   Immediately thereafter, Ropes began an "investigation" into Ray, led by "Chief People Officer" Joy Curtis.

132.   And as a result, the firm issued a "reprimand" not regarding his work product, but his social interactions, claiming, among other things that he "barked" orders like a dog at others and did not "make eye contact."

- 17 -

133.    This "investigation" was merely a dishonest attempt to discredit Ray and

deflection attention from his complaints regarding the "token black associate" assignment, the

"nigger" joke, and other comments and conduct in the firm at the time.

134.    Indeed, the firm did not interview any of the partners, associates, secretaries or

paralegals that Ray had worked with over the last three years.

135.    When Ray asked for some the basis for the conclusions, the firm refused.

136.    Instead, the firm claimed that the upcoming upward evaluations would be a good

measure of whether there were any problems.

137.    In the upward evaluations, no issues were raised by anyone, however.

138.    Ray never received an evaluation, because fewer than 3 associates had even

responded, below the statistical significance measure by the evaluation firm.

139.    The upward evaluations for others, and in particular whites, however, did include

substantial and negative comments.

140.    It was clear that Ropes conducted its "investigation" in response to and merely as

a means of rebutting Ray's complaints regarding the "token black associate" comments and

assignment, "nigger" jokes, and his perception of disparate treatment of blacks.

> iv.    **To teach Ray a lesson for his complaints, Ropes further retaliated and
> stopped providing Ray the significant work assignments and
> responsibility he had received prior to 2008 and his complaints.**

141.    Ray objected to the "investigation" to Robert Jones (who had recently that year

been appointed to serve as the assignment partner), because none of the partners, associates,

secretaries or paralegals he had worked with over the last three years were even interviewed —

making it appear more pretextual and manufactured to respond to his objections.

142.    While Jones assured Ray that the "investigation" would not affect his work

assignments and opportunity to move forward, if he remained quiet, Jones warned Ray that

- 18 -

Ropes had a strong "culture" that it would protect; Jones said that partners had begun to take notice of his complaints of discrimination and the "culture" at the firm, threatening Ray that if he continued, there would be a further response.

143.    Ray, however, made clear to Jones that he would not accept "token black associate" comments or assignments or "nigger" jokes, and that he merely wanted to continue the success he had accomplished in the last three years.

144.    Shortly thereafter, in late June 2008, Diane Patrick contacted Ray to discuss his complaints, as a member of the firm's "Diversity Committee."

145.    Ray extensively detailed his concerns to Patrick, who was appalled by the conduct of her partners.

146.    Patrick, however, never responded.

147.    She remained quiet.

148.    Instead, Jones, hearing of the continued complaints and opposition, refused to provide Ray any further substantive work assignments — the almost exclusive means for work in Ropes' system — at a time when substantial work opportunities were available.

149.    Prior to the complaints, whenever Ray requested work, he was immediately supplied with projects.

150.    After Ray's complaints in 2008, concerning the "token black associate" assignment, the "nigger" joke, and other "culture" issues, however, Jones hardly responded to his requests at all, pushing his availability to 75-90%, rates Ray had never experienced at Ropes on a consistent, sustained basis.

151.   His work requests, maintained in the firm's electronic system, showed a striking

pattern:

| Date Sent | % Avail | Work Preferences |
|---|---|---|
| 5/31/2007 | 0% | |
| 7/13/2007 | 0% | |
| 7/26/2007 | 0% | |
| 8/14/2007 | 75% | I have lots of time |
| 9/13/2007 | 20% | I am in a strange place, with a couple large outstanding motions that could dramatically c… |
| 10/11/2007 | 0% | |
| 1/17/2008 | 30% | I should be able to manage another big project. |
| 4/22/2008 | 90% | I am pretty wide open, and could take on several new large projects. |
| 5/8/2008 | 25% | Still some availability, but not pressing for an assignment.  Any appellate work? |
| 5/15/2008 | 20% | Still some availability, but not pressing for an assignment.  Any appellate work? |

**[*** COMPLAINTS TO ROBERT JONES AND DIANE PATRICK ***]**

| | | |
|---|---|---|
| 6/9/2008 | 50% | Still a fair amount of availability.  Could take on a few projects, maybe one big o… |
| 6/12/2008 | 75% | Becoming much more wide open (with only two reply briefs on the horizen).  Able to tak a c… |
| 7/10/2008 | 75% | Pretty wide open |
| 7/21/2008 | 75% | Still pretty wide open…. |
| 8/11/2008 | 75% | Need work…. |
| 8/15/2008 | 85% | Still Need work…. |
| 8/28/2008 | 90% | Still need work…. |
| 9/19/2008 | 50% | Still need work…. |
| 10/9/2008 | 80% | I am really hurting here…. |
| 11/18/2008 | 75% | Ready to really start staffing up again… |
| 12/1/2008 | 90% | Very little work….need to start building up new projects again |
| 12/5/2008 | 90% | Almost no work….need to start building up new projects again… |

(Exhibit 5, at 1.)

152.   Indeed, while in 2007, Ray was able to bill 269.5 hours in June, in 2008 his hours

declined dramatically to 96.75 for June in 2008.

153.   For the six month period between June and December, Ray's hours declined dramatically, from 1,111.75 the year before to 882.2.

154.   To even maintain those hours, Ray had to seek work assignments from partners directly, which is exceptional and discouraged in Ropes' system.

155.   Work, however, was available.

156.   Ray raised the lack of work assignments to several partners.

157.   In discussing the issue with Bodner, Bodner expressed concern, because, he said, "you should be the last person in the firm without work."

158.   In a conversation with John Donovan, Donovan said that it was "unusual" that an associate of Ray's "vintage" would not have work, as the firm was still busy at that time.

159.   Donovan promised to look into the matter, but advised that Ray continue to seek opportunities from Jones.

160.   Jones, however, continued to withhold work assignments.

161.   It was clear that Jones was acting in retaliation for (and, immediately after Ray raised) complaints of racial discrimination and retaliation.

162.   At this critical time, when it was important for Ray to continue to work with new partners, and further build relationships, demonstrating his ability and skill, Ropes and its partners cut those opportunities as payback for his complaints.

> v.   **Ropes & Gray wrongfully denied Ray partnership because of and in retaliation for his opposition to the "token black associate" assignment and for his complaints of discrimination and retaliation.**

163.   On December 17, 2008, Ray met with Donovan to discuss his year-end evaluation.

164.   To rebut the complaints of discrimination and retaliation, both Donovan and John

Montgomery, among others, prepared a substantially false, misleading and incomplete evaluation

for 2008, a supposed "360 degree review" of the last four years.

165.   It was apparent that the "360 degree review" was merely a pretext, and a cover,

given that, as only a few examples:

- Buffone, who only the year before commented "Impressed with his ability" and
made clear his belief that Ray "is on the partnership track," had no comments in
2008, and did not even appear to have been questioned.

- Significant substantive comments from Bodner were conspicuously absent, when
he only the year before stated: "Worked a lot with him. Positive experience with
him. Brooks Automation – senior associate. Got up to speed quickly. Good
writer. Tireless worker. If going to battle, want him on his wing."

- Comments from O'Connor were missing entirely.

166.   Those three partners, however, accounted for a substantial percentage of the work

Ray performed for the firm as a senior associate, and had significantly praised his work.

167.   At the meeting, Donovan did not even make an effort to present the false review,

but simply informed Ray that insofar as his partnership prospects, "it is not going to happen."

168.   Donovan claimed that the firm did not believe that Ray was a "thirty-year bet,"

and he was denied further consideration for partner, or counsel.

169.   It was clear that the firm had decided to retaliate as means of addressing the

"token black associate" and "nigger" joke debacle.

## II.   ROPES & GRAY AND ITS PARTNERS CONSPIRED TO FURTHER
RETALIATE, DAMAGE RAY'S CAREER AND OBSTRUCT A FULL AND FAIR
INVESTIGATION OF THE CLAIMS OF DISCRIMINATION AND
RETALIATION.

170.   After Ray filed a legitimate and good faith charge of discrimination and

retaliation with the EEOC on May 15, 2009, Ropes and its partners made a concerted effort to

frustrate and obstruct any legitimate review of the claims, and significantly destroy his career.

171.     Ropes concealed evidence, particularly evidence concerning the retaliation and

Ray's work on the *Long Beach Mortgage* proposal (the "token black associate" case), and

removed email from Ray's saved computer files.

172.     Ropes locked Ray out of the office.

173.     Ropes threatened Ray that there would be consequences for his complaints about

his disparate treatment and various comments by its partners, warning he had "burned bridges."

174.     Ropes partners refused to provide references or recommendations that they had

previously agreed to provide in order to "blacklist" and punish Ray, destroying employment

opportunities for him.

175.     Ropes and its partners then lied to the EEOC.

176.     And after the EEOC rejected the firm's false and misleading claims regarding

retaliation, Ropes and its partners refused to accept the findings of the EEOC that they violated

the law, without any legitimate basis to dispute its determinations.

177.     Ropes and its partners merely endeavored to prolong the wrongful conduct for as

long as possible to inflict as much injury and harm to Ray as they could, to serve as a lesson to

other blacks that they will suffer severe personal and financial costs if they expect fair and equal

treatment, or that Ropes abide by the civil rights laws.

    *A.*    ***John Donovan Locked Ray Out Of His Office In Retaliation For His Complaint of Discrimination Against The Firm, In A Constructive Termination That Denied Ray Substantial Work Opportunities And Resources To Find New Employment.***

178.     On February 22, 2011, the EEOC issued a final determination concerning the

claims of retaliation, including those claims concerning Donovan, that "[t]he evidence supports a

finding that [Ropes & Gray] retaliated against [Ray] for filing his charge with the EEOC."

(Exhibit 1, at 1.)

- 23 -

179.     The EEOC carefully reviewed the evidence, including a request for reconsideration filed by Ropes & Gray, and repeatedly rejected claims that Donovan had any legitimate grounds for the retaliation.

180.     Ropes has never disputed the facts.

181.     After the wrongful and discriminatory denial of partnership consideration in December 2008, instead of formally protesting the firm's decision, Ray made an effort to find another opportunity and simply continue his success at another firm.

182.     Departing associates at Ray's seniority level were provided six months to make a transition.

183.     Because of the state of the economy, however, on April 16, 2009, Ray anticipated the need for and requested additional time, seeking a compromise and making clear that "[w]hile I can't say that I feel the [Policy Committee's] decision was fair or appropriate … I really don't want to challenge any decision. I would like to make a transition and continue my career at a firm where I have support."

184.     Rather than provide him that opportunity, Ropes attempted to exact a waiver and release of liability for its misconduct.

185.     On May 11, 2009, Ropes sent Ray an agreement letter, for the first time demanding a liability release in exchange for the time the firm allowed, and in particular requesting a release of claims based on "Title VII of the Civil Rights Act … and the fair employment practice statutes of the Commonwealth of Massachusetts."

186.     Ray emailed Donovan that day to address his concerns, and informed Donovan that if the firm was seeking a liability release, it was necessary to have a broader discussion about his concerns, as Ray had a draft complaint concerning his perceptions.

- 24 -

187.     The next day, Donovan claimed, "I'm happy to have a discussion. Please forward your draft -- in whatever form it is in -- promptly if it is to be a starting point for discussion."

188.     On May 14, 2009, Ray sent Donovan a good faith draft complaint.

189.     After receiving the draft complaint, however, rather than conduct any investigation or attempt to determine any facts, or even attempt the discussion Donovan claimed he was "happy to have" a few days before, Donovan led an effort to retaliate.

190.     The next morning, on a telephone call, on May 15, 2009, Donovan said Ray had two options: to sign the release and receive a two-month extension or to be terminated as of June 30, 2009.

191.     Ray again refused to sign the release.

192.     Donovan then told Ray that as a consequence, "we don't want you to come back," that Ray would be locked out of the firm, his belongings would be packed up and mailed to him, and because of his complaint (and refusal to sign the liability release), he had "burned bridges."

193.     Ray confirmed the telephone conversation with an email to Donovan immediately after the call, and invited Donovan to correct any inaccurate description.

194.     While Donovan claimed to "disagree with your characterization of our conversation," he did not deny his "we don't you to come back" and "burned bridges" comments, and reiterated in writing his retaliatory lockout, that "I will have your secretary forward the personal items in your office to your home."

195.     Ray went directly to the Boston Area Office of the EEOC and filed a legitimate and good faith charge of discrimination and retaliation against Ropes and its partners.

196.     Ray emailed Donovan from the EEOC office, notifying him that he was filing his charge with the EEOC.

197. Donovan then had security deactivate Ray's security card, and immediately went to Ray's office and secretary, to secure his office and remove all electronic files from his computer.

198. Donovan requested that Ray return all firm equipment, and discontinue any work on any matter.

199. Ray, at that time, was still working on several significant matters, including a potential first chair trial opportunity.

200. The forced lockout and retaliation substantially impaired Ray's efforts to seek new employment, denying him opportunities for additional work and experience, access to the partners who had agreed to provide references and letters of recommendations, the resources of the firm in seeking new employment and generally the status of a full time senior associate that prospective employers would consider.

201. Donovan's actions were deliberate and willful, an extremely poor exercise of judgment that exposed the firm to significant liability and a clear violation of Title VII.

202. The firm, however, continues to defend and support his violations of law, as determined by the EEOC.

**B.    *Randall Bodner Deliberately Retaliated Against Ray, Knowingly Violating Title VII And Disregarding The Findings Of The EEOC To Punish Ray And Substantially Prejudice Any Lawful And Fair Adjudication Of The Discrimination And Retaliation Claims Against Ropes And Its Partners.***

203. On February 22, 2011, the EEOC issued a final determination concerning the claims of retaliation, including those claims concerning Bodner, that "[t]he evidence supports a finding that [Ropes & Gray] retaliated against [Ray] for filing his charge with the EEOC." (Exhibit 1, at 1.)

- 26 -

204.    The EEOC carefully reviewed the evidence, including a request for reconsideration filed by Ropes & Gray, and repeatedly rejected claims that Bodner had any legitimate grounds for the retaliation.

205.    Bodner, however, has consistently refused to comply with the findings of the EEOC.

206.    Bodner willfully disregarded the federal civil rights agency, and its determinations, for no apparent or articulated reason other than to undermine the credibility and power of that agency, and the protections of the civil rights laws, so that his partners could avoid accountability for their discrimination and misconduct.

207.    The facts of Bodner's violation of the civil rights laws have never been disputed.

208.    After Ray was wrongfully denied partnership, Bodner was a strong advocate on his behalf.

209.    Bodner emailed Ray in early December 2008, to say he "would be glad to serve as a reference." (*See* Exhibit 6, at 1.)

210.    And, in December 2008, Bodner called Skadden, Arps, Meager, Slate & Flom LLP partner James Carroll to recommend that Skadden consider Ray.

211.    Carroll emailed Ray that Bodner "certainly speaks very highly of you." (Exhibit 7, at 1).

212.    Prior to the charge of discrimination and retaliation, Bodner never declined a request to provide a reference or recommendation for Ray.

213.    In response to April 27, 2009 and May 5 requests from Ray for letters of recommendation to apply to the United States Attorney's Office for the Southern District of New

York ("SDNY office") and others, Bodner replied on May 5, 2009, that he "would be happy to." (Exhibit 8, at 1.)

214.    Immediately after Ray filed the charge of discrimination and retaliation with the EEOC on May 15, 2009, however, Bodner retaliated, thereafter refusing to serve as a reference or provide letters of recommendation.

215.    On May 18, 2009, Ray emailed Bodner seeking the letters of recommendation.

216.    Bodner did not respond.

217.    As a consequence, on June 10, Ray emailed Bodner again, explaining that the SDNY office had extended its application deadline and that he was still hoping to receive the letters of recommendation as part of his application.

218.    Ray made clear that "[t]hey need to be sent with the application, and ... [he] wanted to put it in as soon as practicable given the late date."

219.    Finally responding that day, Bodner made clear his intent to teach Ray a lesson for his complaint against the firm, and to "blacklist" him.

220.    In an email dated June 10, 2009, Bodner stated "it is my understanding that you have asserted a claim against Ropes & Gray alleging that the firm somehow discriminated against you ... given the fact that I believe you are brining a groundless claim for your own personal benefit, I simply do not feel now that I can write a recommendation in good conscience ...." (*See* Exhibit 9, at 2.)

221.    But Bodner had neither read any allegation, nor investigated the complaint.

222.    He merely intended to exact revenge and prevent any fair hearing of the claims of discrimination and retaliation.

223.    More than that, Bodner lied.

- 28 -

224.     He had no "good conscience" reservations about providing a letter of recommendation.

225.     Indeed, Bodner did write a "letter of recommendation" in spite of his "good conscience" some nine months later — on Ropes & Gray letterhead.

226.     The delay was merely to prove that Bodner could inflict harm and destroy career opportunities for Ray so long as the charge was pending.

227.     To further prove that point, the letter Bodner did write was substantially negative when compared to his evaluations and against the recommendation he provided to Skadden Arps partners prior to the charge in December 2008.

228.     On December 9, 2009, Ray asked again that Bodner serve as a reference, as he said he "would be glad to," at the request of Pennsylvania State University, Dickerson School of Law for a Ropes reference.

229.     Bodner responded promptly the next day, "my position in my earlier email of June 10 is unchanged."

230.     He never responded to Penn State or its requests.

231.     Bodner's refusal to provide a reference was a substantial reason why Ray did not receive an offer of employment.

232.     On December 27, 2009, however, Ray wrote to Bodner again, this time providing the extensive case law concerning "blacklisting" to Bodner.

233.     Bodner did not respond.

234.     Instead, Mandel responded, on December 28, claiming "I am representing Randy in connection with your claims concerning him.... Neither Randy nor Ropes & Gray agree with

the assertions in your email, and we will respond to them at the appropriate time and in the appropriate manner."

235. Ropes, however, has never responded.

236. Indeed, Mandel claimed on January 14, 2010, that "[Bodner is] not obliged under the Disciplinary Rules to respond to your requests for letters of recommendation, and therefore I am not obliged under the Disciplinary Rules to respond on [his] behalf."

237. Nonetheless, on January 20, 2010, Mandel provided a letter of recommendation by Bodner, on Ropes & Gray letterhead.

238. The letter, however, did more to disparage Ray than recommend him, and fell far short of the high remarks Bodner had previously provided to Skadden Arps, without any negative comments.

239. This letter was clear retaliation by Bodner and Mandel.

240. Moreover, on February 22, 2011, when the EEOC determined that Bodner had engaged in retaliation in violation of the civil rights laws, Bodner still refused to provide the letters he agreed to provide.

241. Bodner had no defense for his misconduct, except to damage Ray's career for refusing to be a "token black associate" and his complaints of discrimination and retaliation against the firm.

242. As recently as July 27, 2011, Bodner has still refused to provide any references or recommendations in retaliation for Ray's complaints against Ropes, in spite of repeated subsequent requests, or offer any justification for his retaliation.

243.    Bodner's refusal to serve as a reference or provide the agreed letters of

recommendation has substantially destroyed employment opportunities for Ray, which was the

intent behind his retaliatory refusal.

244.    Bodner's actions were deliberate and willful, an extremely poor exercise of

judgment that exposed the firm to significant liability and a clear violation of Title VII.

245.    The firm, however, continues to defend and support his violations of law, as

determined by the EEOC.

C.    *Brien O'Connor Wrongfully Retaliated, And Conspired To Deceive The EEOC
Concerning His Violation Of Title VII And Efforts To Substantially Injure Ray
And His Career For Complaining About Discrimination And Retaliation At
Ropes.*

246.    On February 22, 2011, the EEOC issued a final determination concerning the

claims of retaliation, including those claims concerning O'Connor, that "[t]he evidence supports

a finding that [Ropes & Gray] retaliated against [Ray] for filing his charge with the EEOC."

(Exhibit 1, at 1.)

247.    The EEOC carefully reviewed the evidence, including a request for

reconsideration filed by Ropes & Gray, and repeatedly rejected claims that O'Connor had any

legitimate grounds for the retaliation.

248.    Indeed, Mandel and O'Connor conspired to lie to the EEOC and claim that

O'Connor had never agreed to provide any letter of recommendation, instead of offer any

legitimate justification.

249.    In December 2009, Mandel claimed to the EEOC that that "[t]he Firm is not

aware of other partners [beside Bodner] who have declined to provide Mr. Ray with a letter of

recommendation, nor is the Firm aware of any relevant circumstances," in the face of Ray's

claims that O'Connor retaliated in exactly that way.

250.    Likewise, Mandel later claimed to the Massachusetts Attorney General's Office,
in March 2010, that "[t]he Firm does not concede that Mr. O'Connor had ever promised to
provide a recommendation to Mr. Ray."

251.    Mandel and O'Connor intended to mislead the EEOC and the Massachusetts
Attorney General, concerning the retaliation.

252.    Moreover, following the determination by the EEOC, O'Connor has consistently
refused to comply with the findings.

253.    The facts of O'Connor's violation of the civil rights laws have never been
disputed.

254.    O'Connor had repeatedly, in evaluations and emails, praised Ray for his work on
several matters for him, and generally had been a strong supporter of Ray in the firm.

255.    In light of this fact, on April 29, 2009, and again on May 5, Ray wrote emails to
O'Connor requesting letters of recommendation to apply to the SDNY office and several other
offices.

256.    In response to Ray's request for letters of recommendation, O'Connor replied on
May 5, 2009, stating "I would be very happy to do a letter for you.  Really sorry to be slow on
this. Are you around tomorrow?"  (Exhibit 10, at 1.)

257.    And therefore, he and Ray tried to schedule a time to discuss the letters of
recommendation O'Connor agreed to write, given their schedules.

258.    Immediately after Ray filed a charge of discrimination and retaliation with the
EEOC on May 15, 2009, however, O'Connor retaliated, refusing to respond to Ray, to schedule
any time to discuss the letters, or write the recommendations he claimed he was "very happy" to
provide.

259.    On May 18, 2009, Ray followed up with O'Connor seeking the letters of

recommendation.

260.    O'Connor did not respond.

261.    Again on June 10, Ray emailed O'Connor.

262.    He explained that the SDNY office had extended its application deadline and that

he was still hoping to receive the letters of recommendation as part of his application.

263.    O'Connor again did not respond.

264.    Ray made several requests to O'Connor to provide the requested letters of

recommendation, and serve as a reference.

265.    To date, O'Connor has never responded to any of Ray's further requests.

266.    Instead, Mandel intervened on O'Connor's behalf, as he did with Bodner, refusing

to respond or provide any explanation for the clear retaliation by O'Connor immediately after

Ray filed his charge with the EEOC.

267.    As recently as July 27, 2011, O'Connor has still refused to provide any references

or recommendations, in spite of repeated subsequent requests, in retaliation for Ray's complaints

against Ropes.

268.    O'Connor's refusal to serve as a reference and provide the agreed letters of

recommendation have substantially destroyed employment opportunities for Ray, which was the

intent behind his retaliatory refusal.

269.    O'Connor's actions were deliberate and willful, an extremely poor exercise of

judgment that exposed the firm to significant liability and a clear violation of Title VII.

270.    The firm, however, continues to defend and support his violations of law, as

determined by the EEOC.

**D.    David Mandel Concealed Evidence And Lied To The EEOC, And Counseled And Encouraged Other Partners To Lie and Mislead The EEOC Into Making False Findings, In Retaliation Against Ray For His Complaints.**

271.    In retaliation for Ray's charge of discrimination and retaliation against Ropes, Mandel, claiming to represent Ropes, engaged in a series of dishonest and unethical schemes to deceive the EEOC and discourage Ray from advancing his charge, and damage his career.

272.    For his efforts to deceive the EEOC, Mandel has subjected himself to Massachusetts Board of Bar Overseers investigation and potential disciplinary sanctions.

273.    Mandel made knowingly false and misleading statements to the EEOC regarding the discrimination and retaliation.

274.    For instance, on December 4, 2009, regarding O'Connor, while conceding that Bodner refused to provide letters of recommendation in response to Ray's charge of discrimination (but misrepresenting the facts), concerning O'Connor, Mandel falsely claimed to the EEOC that "[t]he Firm is not aware of other partners who have declined to provide Mr. Ray with a letter of recommendation, nor is the Firm aware of any relevant circumstances."

275.    Merely a few weeks later, in an email to Ray, Mandel admitted his knowledge that O'Conner "declined to provide Mr. Ray with a letter of recommendation," stating in no uncertain terms on January 14, 2010, that "Brien O'Connor has consistently declined to respond to your requests for a letter of recommendation."

276.    This statement too was knowingly false, however.

277.    Nonetheless, Mandel later repeated this claim, deliberately making a similar false misrepresentation to the Massachusetts Attorney General's Office, on March 30, 2010, responding to a criminal investigation of a record keeping violation by Ropes & Gray, stating "[t]he Firm does not concede that Mr. O'Connor had ever promised to provide a recommendation to Mr. Ray."

278.    In this and a number of other instances, Mandel made deliberately false statements concerning Ray, to harass and impugn his integrity and character, in retaliation for his claims of discrimination and retaliation against the firm, and to discourage him from advancing his claims.

279.    Further, to prevent Ray from proving his claims, Mandel concealed evidence and actively participated in, and encouraged Bodner and O'Connor to continue their retaliation, and encouraged other partners to lie, as a means to frustrate and obstruct a full and fair investigation by the EEOC, and to merely harass and disrupt Ray's career opportunities.

280.    In response to a Personnel Records Request by Ray for all of his hours at the firm, Mandel withheld records that showed his work on the *Long Beach Mortgage* proposal and that rebutted false defenses Mandel offered to the EEOC.

281.    Mandel also refused to provide the emails from Bodner and O'Connor regarding the letters of recommendation, so that Mandel could mislead the EEOC and claim the firm lacked knowledge about the retaliation.

282.    Indeed, in spite of Mandel's participation in the retaliation by Bodner and O'Connor, Mandel has consistently refused to provide any legitimate explanation for their misconduct.

283.    Rather, Mandel promoted the retaliation.

284.    When Ray requested by email a letter of recommendation from Bodner, on December 27, 2009, citing the uninterrupted line of federal cases that had rejected "blacklisting" as a clear Title VII violation, and copied O'Connor, Mandel intervened to keep the scheme going, demanding that Ray "refer any communications to me."

285.    In response, Ray directed his requests to Mandel.

286.    Mandel claimed, on January 14, 2010, that Bodner and O'Connor are "not obliged under the Disciplinary Rules to respond to your requests for letters of recommendation, and therefore I am not obliged under the Disciplinary Rules to respond on [his] behalf."

287.    Nonetheless, on January 20, he produced a "letter of recommendation" from Bodner, which was substantively negative when compared to Bodner's prior evaluations and references, and was significantly disparaging.

288.    Ray objected to the continued retaliation and negative reference, and sent at least six additional follow-up requests to Mandel seeking appropriate references and recommendations over the course of the last two years.

289.    Mandel never responded.

290.    In addition, Mandel conspired with Trimmier to mislead to the EEOC concerning the "token black associate" comment and assignment by Skinner.

291.    To the EEOC, Mandel claimed that Trimmier discussed the *Long Beach Mortgage* case with Ray, which they both knew was false, as reflected in Ray's non-billable hours, which Mandel refused to produce.

292.    Mandel's actions were designed for no legitimate purpose but to threaten and coerce Ray into abandoning his charge of discrimination and retaliation against the firm, and to destroy career opportunities for Ray, which they did.

293.    Mandel's actions were outrageous, deliberate and willful, an extremely poor exercise of judgment that exposed the firm to significant liability and a clear violation of Title VII.

294.    The firm, however, continues to defend and support his violations of law.

### III. ROPES & GRAY AND ITS PARTNERS HAVE INTENTIONALLY AND WRONGFULLY INFLICTED SUBSTANTIAL INJURY AND HARM UPON RAY AND HIS LEGAL CAREER.

295.    In spite of his best efforts, and as a direct and proximate cause of Ropes & Gray's discrimination and retaliation, Ray has been prevented from advancing his legal career, and his prospects for partnership (or other significant legal employment) have been dramatically diminished, if not destroyed.

296.    Ropes' and its partners' conduct was willful and deliberate, knowingly in violation of the civil rights laws, and have continued in spite of the determination of the EEOC that the retaliation violated the law.

297.    Ropes' and its partners' misconduct has created irreparable harm and substantial damages.

### CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT
(against Ropes & Gray)

298.    Ray incorporates by reference Paragraphs 1 through 297 as if set forth fully herein.

299.    Ray and Ropes & Gray entered into a legally enforceable contract.

300.    As part of their agreement, and in exchange for Ray rejecting employment offers from several other prominent law firms in Boston, and agreeing to provide his legal services exclusively on behalf of and in connection with his employment with Ropes & Gray, the firm promised that "there shall be no unlawful discrimination against any employee or applicant for employment on grounds of race [or] color ...."

301.    Ropes materially breached this promise.

302. Instead of providing Ray a race-blind application of its employment decisions, Ropes, through various partners, tasked him explicitly as a "token black associate," to serve merely as a "black face" instead of providing him fair opportunities for serious client contact and business development at a time when he was under review for partnership — an opportunity that was offered to his white counterparts.

303. Ropes denied him equal litigation support, which impaired his ability to meet the expectations of his supervising partner — support that Ropes did provide to a later white associate.

304. When Ray opposed this misconduct, Ropes retaliated and denied him work opportunities, all in violation of its promise that "there shall be no unlawful discrimination .... on the grounds of race [or] color."

305. And when he complained again, refusing to sign a release of liability for the firm's discrimination and retaliation, Ropes retaliated again, locking Ray out of the office and refusing to provide Ray references and recommendations that partners had previously agreed to provide, among other misconduct and retaliation.

306. As a consequence of this material breach of the terms of his employment agreement, Ray was wrongfully denied partnership or counsel at Ropes, and the opportunity to advance his career at another firm or elsewhere.

307. As a direct and proximate cause of Ropes' material breach of the terms and conditions of the employment agreement, Ray suffered significant, irreparable harm and damages.

## COUNT II – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
(against Ropes & Gray)

308.    Ray incorporates by reference Paragraphs 1 through 307 as if set forth fully

herein.

309.    Under Massachusetts law, every contract, including an employment agreement,

has an implied covenant of good faith and fair dealing.

310.    Ropes violated the implied covenant of good faith and fair dealing by engaging in

a series of misconduct involving racially disparate treatment, knowingly false schemes and

retaliation to prevent Ray from advancing as a senior associate into the partnership, or counsel,

or finding other comparable employment.

311.    Among other things, in retaliation for his good faith complaints of discrimination,

Ropes:

- led a retaliatory and knowingly false and disparaging "investigation;"
- refused to provide substantive work assignments;
- orchestrated a retaliatory office lockout;
- refused to provide agreed references and letters of recommendation; and
- concealed documents, lied to various government agencies, and made knowingly false and disparaging statements.
- 

312.    Ropes' misconduct not only breached the implied covenant applied to ordinary

actors, but the heightened duty of candor, integrity and honesty applied to attorneys, who are

vested with the public trust, and are expressly directed not to "engage in conduct involving

dishonesty, fraud, deceit, or misrepresentation" or "prejudicial to the administration of justice."

313.    As a consequence of this material breach of the implied covenant, Ray was denied

fair and equal consideration for partnership, or counsel, as well as the opportunity to pursue

career opportunities elsewhere.

314.    As a direct and proximate cause of the schemes, false statements and misconduct

by Ropes, Ray suffered significant, irreparable harm and damages.

## COUNT III – VIOLATION OF TITLE VII OF THE
## CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000e-2)
## (UNLAWFUL DISCRIMINATION)
(against Ropes & Gray)

315.    Ray incorporates by reference Paragraphs 1 through 314 as if set forth fully

herein.

316.    42 U.S.C. § 2000e-2 provides that "[i]t shall be an unlawful employment practice

for an employer ... to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race [or] color ...."

317.    Ray had a distinguished career at Ropes; indeed, when presented with one of the

most prominent criminal defendants in a complicated securities case, Ray was selected to lead

the team representing former Enron CEO Ken Lay.

318.    There was no question that he had earned the trust, confidence and respect of the

partnership at the time.

319.    Nonetheless, Ray was subjected to disparate treatment in his work assignments

that substantially impaired his prospects for partnership.

320.    As the senior associate leading a complex tax litigation matter, Ray was denied

the support of additional litigation team members to meet the demands of the supervising partner

and the needs of the client.

321.    The white associate who subsequently handled the matter was provided a mid-

level associate to assist him with the work.

322.    Because of the lack of support, the supervising tax partner, Richard, substantially

criticized Ray.

323.    In his eighth year, and under serious consideration for partnership, in spite of his accomplishments, Ray was asked to serve merely as a "token black associate" and be a "black face" for the firm to solicit discrimination business.

324.    In that year, the firm refused to provide serious work and career development opportunities to advance his career, working for clients on significant litigation matters as Ray had previously, which was important for him to increase his interaction among partners and display his abilities for partnership.

325.    His white counterparts were never charged with race-baiting campaigns, nor asked to serve as "tokens," but were given substantive assignments to develop for partnership.

326.    When Ray complained about this misconduct, and other racial incidents at the firm, Ropes retaliated.

327.    Ropes conducted a pretextual and knowingly false "investigation," as a means to rebut Ray's complaints about the "token black associate" assignment, "nigger" jokes and other issues at the firm.

328.    Ropes refused to provide additional substantive work to Ray, to force a substantial decline in his hours, work and relationships, and preclude his advancement.

329.    In the end, he was wrongfully denied partnership, or counsel.

330.    As a direct and proximate cause of Ropes' disparate treatment and unlawful discrimination, Ray suffered significant, irreparable harm and damages.

### COUNT IV – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000e-3(a)) (UNLAWFUL RETALIATION)
(against Ropes & Gray)

331.    Ray incorporates by reference Paragraphs 1 through 330 as if set forth fully herein.

- 41 -

332.    42 U.S.C. § 2000e-3(a) provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter ..."

333.    After Ray's legitimate and good faith opposition to the discriminatory environment and treatment at Ropes, and in particular Ropes' disparate treatment of Ray as a "token black associate," Ropes engaged in a continuous and repeated retaliatory campaign against him, starting with a pretextual "investigation," followed by refusals to provide him further substantive legal work to build client and professional relationships important for partnership.

334.    As a direct consequence of Ropes' retaliation, Ray's billable hours declined dramatically, from 1111.75 in the last six months of the year before to 882.2 in that same period in 2008 (and would have declined further but for his efforts to create his own work), significantly destroying important work opportunities.

335.    After Ray complained a fourth time about the firm's misconduct, providing a good faith draft complaint regarding his concerns to Donovan and the EEOC, and refusing to sign a liability release, Ropes retaliated again.

336.    The next day, without any investigation, review of the complaint, or any attempt to discuss his concerns, Donovan locked Ray out of his office, and deactivated his security card, telling him "we don't want you to come back" and you have "burned bridges" as a result of his complaints to the firm and the EEOC.

337.    In addition, and immediately after his complaints to the firm and the EEOC, Bodner and O'Connor, who had previously agreed to serve as references and write letters of recommendation in support of Ray, then refused in retaliation for his complaints.

338.    Bodner acknowledged that his refusal was expressly based on Ray's complaints about his experience of discrimination and retaliation in the firm, though Bodner had never reviewed the allegations or investigated any of the facts surrounding the claims — he merely retaliated.

339.    Both Bodner and O'Conner, along with Mandel, have continued the retaliation effort, refusing to respond to subsequent requests to provide the agreed references and letters of recommendation, and destroying career opportunities for Ray.

340.    Nearly nine months into the retaliation campaign, and well after they had already destroyed several significant opportunities, Mandel delivered a retaliatory and negative "letter of recommendation" from Bodner, on Ropes & Gray letterhead, in further retaliation and to further disparage Ray and damage his career advancement.

341.    Mandel and O'Connor conspired to conceal the retaliation, and deceive and mislead the EEOC regarding their misconduct, lying to the EEOC and others about the facts and circumstances concerning the retaliation, among other things.

342.    And Ropes made knowingly false and misleading statements concerning Ray, to harass and impugn his integrity and character, in retaliation for his claims of discrimination and retaliation against the firm.

343.    Ropes has persistently refused to stop its retaliation, even after the EEOC found the misconduct violated Title VII, willfully and deliberately violating the law.

344.    As a direct and proximate cause of this retaliation, Ray suffered significant, irreparable harm and damages.

## COUNT V – VIOLATION OF MGL c. 93, SECTION 102
## (UNLAWFUL DISCRIMINATION)
(against all Defendants)

345.   Ray incorporates by reference Paragraphs 1 through 344 as if set forth fully herein.

346.   MGL c. 93, Section 102, provides that "[a]ll persons within the commonwealth, regardless of sex, race, color or national origin, shall have ... the same rights enjoyed by white male citizens to make and enforce contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property."

347.   Defendants engaged in a series of schemes designed to deny Ray the opportunity to defend himself, enforce his contract rights, and to contract for a partnership interest in the firm or other firms, as well as to sue and give evidence, including but not limited to by engaging in efforts to deceive the EEOC and a pretextual, coordinated effort to make a knowingly false and misleading record of alleged misconduct.

348.   After his good faith objections and complaints, including to the EEOC, concerning the misconduct, Defendants engaged in retaliatory schemes to conceal evidence, make knowingly false and misleading claims, and retaliate in order to harass and intimidate Ray into foregoing the rights and protections afforded him under law, and prevent a full and fair investigation and subsequent adjudication of his claims.

349.   Although Jones, Donovan, Mandel, Bodner, O'Connor and Curtis were the principal perpetrators of these schemes, acting on behalf of the firm, upon information and belief, each of the other Defendants, as members of the Policy Committee, had knowledge of, participated in and approved the misconduct.

- 44 -

350.    As a direct and proximate cause of those actions, Ray suffered significant, irreparable harm and damages.

### COUNT VI — VIOLATION OF MGL c. 151B, SECTION 4(1)
### <u>(UNLAWFUL DISCRIMINATION)</u>
(against all Defendants)

351.    Ray incorporates by reference Paragraphs 1 through 350 as if set forth fully herein.

352.    MGL c. 151B, Section 4(1) provides that "[i]t shall be an unlawful practice ... [f]or an employer, by himself or his agent, because of the race, color ... or ancestry of an individual ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment ...."

353.    Contrary to the legal prohibitions in the Commonwealth, Defendants engaged in unlawful disparate treatment of Ray on the basis of his race and color, not only in the terms and conditions of his employment, treating him as a "token black associate" and limiting his exposure to clients and partners in the firm during a critical period of his employment when necessary for partnership, but Defendants also discharged Ray and refused to provide references unlawfully on the basis of his race and color, as the final accomplishment of a year and a half long racially motivated, discriminatory and retaliatory effort to disrupt his work opportunities and advancement.

354.    These actions were carried out by Jones, Donovan, Mandel, Bodner, O'Connor and Curtis, but also upon information and belief, each of the other Defendants, as members of the Policy Committee, had knowledge of, participated in and approved the misconduct.

355.    As a direct and proximate cause of those actions, Ray suffered significant, irreparable pecuniary injury, harm and loss.

## COUNT VII — VIOLATION OF MGL c. 151B, SECTION 4(4) AND 4(4A)
## (UNLAWFUL RETALIATION)
(against all Defendants)

356.    Ray incorporates by reference Paragraphs 1 through 355 as if set forth fully herein.

357.    Under MGL c. 151B, Section 4(4) "[i]t shall be an unlawful practice ... [f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter" and under Section 4(4A) "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter."

358.    When faced with disparate and unfair treatment on the basis of race, made unlawful and forbidden under Massachusetts law, Ray made good faith objections.

359.    Rather than take his objections seriously, conduct any substantive investigation, or implement any change, Defendants retaliated, engaging in a pretextual "investigation," and a string of correspondence and actions designed to harass and intimidate Ray into releasing his rights to fair treatment and equal opportunity under law.

360.    In addition, Defendants refused to provide substantive work assignments necessary for partnership consideration and denied Ray partnership, or counsel, in retaliation for his opposition.

361.    After Ray complained a fourth time, refusing to sign a release of liability for this misconduct, Donovan locked him out of the office, and Bodner and O'Connor, encouraged and enabled by Mandel, refused to provide him references and letters of recommendation they had

agreed to provide prior to his opposition and charge filed with the EEOC, in order to destroy

future employment opportunities and advancement of his career.

362.    Mandel (and O'Connor) consistently lied about the retaliation, among other

misconduct, in order to deceive the EEOC, harass and intimidate Ray from advancing his charge,

and made material, knowingly false and misleading accusations and claims regarding Ray and

his career at the firm.

363.    Although Jones, Donovan, Mandel, Bodner, O'Connor and Curtis were the

principal perpetrators of these schemes, acting on behalf of the firm, upon information and

belief, each of the other Defendants, as members of the Policy Committee had knowledge of,

participated in and approved the misconduct.

364.    As a direct and proximate cause of those actions, Ray suffered significant,

irreparable pecuniary injury, harm and loss.

## COUNT VIII – VIOLATION OF SECTION 93A
## (UNFAIR METHODS OF COMPETITION)
(against Ropes & Gray)

365.    Ray incorporates by reference Paragraphs 1 through 364 as if set forth fully

herein.

366.    Ropes is engaged in trade or commerce within the Commonwealth of

Massachusetts, and the actions and transactions constituting unfair methods of competition

occurred primarily and substantially within the Commonwealth.

367.    Ropes constructively terminated Ray on May 15, 2009, locking him out of his

office and preventing him from returning to work or performing any services on behalf of the

firm or the clients he represented.

368.    Ray provides legal services in the same market as, and after its constructive termination, in competition with Ropes & Gray.

369.    After the constructive termination, Ropes engaged in a pattern of unfair competition to prevent Ray from gaining legal employment or providing services to clients in competition with the firm.

370.    Ropes and its partners had agreed to serve as references and provide Ray letters of recommendation.

371.    They refused, however, only after Ray filed a legitimate and good faith complaint of discrimination and retaliation against the firm with the EEOC.

372.    On February 22, 2011, the EEOC issued a final determination that this conduct violated Title VII of the Civil Rights Act of 1964.

373.    Ropes made knowingly false and misleading statements regarding Ray and his performance and character, in order to preclude him from competing legal employment or providing competing legal services in violation of M.G.L. c. 93A, Section 11.

374.    As a direct and proximate cause of those actions, Ray suffered significant, irreparable pecuniary injury, harm and loss.

## COUNT IX – DEFAMATION
(against Curtis)

375.    Ray incorporates by reference Paragraphs 1 through 374 as if set forth fully herein.

376.    Curtis intentionally, knowingly and maliciously engaged in a pattern of false representations, both orally and in writing, making wholly false, baseless and defamatory accusations against Ray in her "investigation" and "reprimand," in their entirety, which were published to third parties, in order to advance a racially motivated and biased agenda.

- 48 -

377.    In addition, Curtis intentionally, knowingly and maliciously suppressed information contrary to her false claims, to manufacture a false and misleading record.

378.    In retaliation for Ray's objection to her false claims, Curtis increased her efforts, making additional knowingly false statements concerning Ray and her supposed "investigation."

379.    Curtis' defamatory misrepresentations were maliciously designed to impugn his character and professional reputation.

380.    As a direct and proximate cause of her knowingly false and malicious misrepresentations, Ray suffered significant, irreparable harm and damages.

**WHEREFORE**, Ray prays that the Court enter a judgment:

A.    Awarding damages, including compensatory, punitive and trebled damages, to Ray in an amount to be determined at trial;

B.    Awarding Ray his costs and any reasonable attorney's fees; and

C.    Granting Ray such further relief as the Court may deem just and appropriate under the circumstances.

## JURY DEMAND

Ray demands a trial by jury on all issues so triable.

Respectfully submitted,

John H. Ray, III (BBO # 664184)
133 Olde Forge Road
Hanover, MA 02339
(617) 645-3000

Dated:  August 2, 2011

- 49 -