UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11370-RGS

JOHN H. RAY, III

v.

ROPES & GRAY LLP, et al.

ORDER ON PARTIES' CROSS MOTIONS
FOR SUMMARY JUDGMENT

August 16, 2013

STEARNS, D.J.

Plaintiff John H. Ray, III alleges that defendant Ropes & Gray LLP (Ropes) denied him promotion to a partnership in the law firm because of his African-American heritage and then retaliated against him when he complained of discrimination.  Ray seeks damages against Ropes, several partners of the firm, and Joy Curtis, the firm's head of human resources during the relevant time period, variously alleging breach of contract and breach of the covenant of good faith and fair dealing (Counts I & II); unlawful discrimination (Counts III, V, & VI); unlawful retaliation (Counts IV & VII); unfair competition (Count VIII); and defamation (Count IX).[1]  Ray moves for

---

[1] The defamation claim presently survives solely against Curtis. Defamation and invasion of privacy claims against Ropes (Counts X and XI) were dismissed earlier by the court.

summary judgment only as to his state and federal retaliation claims.[2]  Ropes moves for summary judgment on all counts.  A hearing on the motions was held on July 30, 2013.

## BACKGROUND

Ray earned his law degree from Harvard Law School, where he was a Notes Editor on the Harvard Law Review.  After graduation, Ray served as a law clerk to Judge Ann Claire Williams of the Seventh Circuit Court of Appeals.  After completing his clerkship, Ray spent two years as a litigation associate at the firm of Cravath, Swaine & Moore in New York, followed by a year as an associate at Jenner & Block in Chicago.  He joined the Boston office of Ropes in March of 2005 as a fifth year associate assigned to the firm's general litigation department.

Ropes is an international law firm headquartered in Boston.  The firm is comprised of more than 1,000 lawyers, approximately 280 of whom are

---

[2] Ray also moves for summary judgment on a spoilation of evidence claim against Ropes for having destroyed handwritten notes of witness interviews taken during a disciplinary investigation of an incident that occurred between Ray and a female employee of Ropes.  The motion might more properly be framed as one for sanctions, and as such, will be <u>DENIED</u>.  Ray has made no showing that Ropes was under a court order to preserve such notes at the time they were destroyed (assuming such was the case) or under any independent legal obligation to retain them for use in a lawsuit that had not as yet been filed.

partners.  Partnership decisions are made by the firm's Policy Committee and are based primarily on the partners' written and oral evaluations of the candidate, as well as its assessment of the firm's current and future business needs.  The decision to admit an associate to a partnership is typically made during the associate's ninth year after graduation from law school. Ropes, with rare exception, enforces an "up or out" rule.   If the Policy Committee determines that an associate is not qualified at the time of the evaluation for a promotion to partner or counsel to the firm (or is not making satisfactory progress), he or she is asked to leave.  Of the fifty associates who joined the class of 2000 (the year Ray graduated), eight were invited to become partners. None of the eight were members of the general litigation department.

Following a solid first year at Ropes, Ray's performance evaluations grew increasingly less positive.  At the end of 2007, Ray was told that promotion to partner, while still a possibility, would be an "uphill climb."  By the end of 2008, a substantial majority of Ray's reviews were decidedly critical, leading the Policy Committee to conclude that the required consensus did not exist (nor would develop) in support of Ray's candidacy.  As a result, Ray was given notice in December of 2008 that he would not be promoted to a ninth-year associate's position.  Consistent with Ropes's "up or out" policy, Ray was offered six months of severance pay  and the use of his office until June 30,

2009, to facilitate his search for a new job.  Ray requested extensions of the severance period in December of 2008, and February and April of 2009, all of which were denied.

In late April of 2009, Ray requested letters of recommendation from two partners at Ropes, Brien O'Connor and Randall Bodner, in support of his application for a position in the United States Attorney's Office.  Both men agreed to provide recommendations.  On May 11, 2009, Ropes offered Ray a two-month extension of the severance period in exchange for a release of any and all claims against the firm.  Ray demurred and instead on May 14th emailed a draft of a formal discrimination complaint to Ropes partner John Donovan.  Ray told Donovan that he would file the complaint with the United States Equal Employment Opportunity Commission (EEOC) unless Ropes responded with an offer of an indefinite severance period at Ray's current salary and benefits or with a payment of $8.5 million.[3]  The following day, Donovan informed Ray by telephone that he was not to return to the office and

---

[3] Ray contends that Ropes improperly offers evidence of the demand (the fact of which he does not deny) in violation of Fed. R. Evid. 408.  The short answer is that the Rule, insofar as relevant here, bars the use of an offer of compromise as an admission of liability, which is not Ropes's avowed purpose. Rather, Ropes characterizes the "offer," coupled as it was with the threat to file a discrimination complaint, as an attempt at extortion (relevant to the issue of bias).  The evidentiary weight of the offer is a matter for a jury, and has no bearing on the resolution of the motions for summary judgment.

that his secretary would mail his personal items to him.  Ray filed the complaint with the EEOC later that day.

In his complaint to the EEOC, Ray charged Ropes with unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., for its refusal to promote him towards partnership, and with retaliating against him for his having complained to Ropes's senior management about racially derogatory remarks allegedly made by two partners of the firm.  A few weeks after filing the EEOC complaint, Ray emailed Bodner and O'Connor renewing his request for letters of recommendation.  Bodner responded that he was no longer willing to provide a letter because he believed Ray's EEOC complaint to be false and, as a result, he could not in "good conscience" recommend Ray for a position as a federal prosecutor.  O'Connor did not respond to Ray's email.  On December 9, 2009, Ray requested a recommendation letter from Bodner for a faculty position at Pennsylvania State University's Dickinson School of Law.  Bodner again refused.[4]

On January 24, 2011, the EEOC issued a determination, finding no reasonable cause to believe that Ropes had discriminated against Ray or had

---

[4] On January 19, 2010, eight months after Ray's initial request, Bodner furnished Ray with a letter of "recommendation" through counsel.  The letter, however, was lukewarm in tone and referenced the "formal written reprimand" Ray had received from the firm.

retaliated against him.  The transmittal letter included a recitation of evidence, including detailed information about Ray's performance reviews and a description of the internal investigation of Ray and his reprimand by the firm for alleged criminal misconduct with a subordinate.  On February 22, 2011, the EEOC issued a final determination reaffirming the finding of non-discrimination, but concluding that on further consideration, there was probable cause to believe that Ropes had retaliated against Ray for filing the charge with the EEOC.

After an unsuccessful attempt at mediation, Ray mailed the EEOC's February 22, 2011 finding to two United States senators, six congresspersons, and the President of the NAACP.  On May 12, 2011, Ray sent a copy of the EEOC decision to Dean Martha Minow of Harvard Law School, as well as to the Harvard Black Law Students Association and the Harvard Law Record.  On May 13th, the legal media website *Above the Law* emailed Timothy Larimer, Ropes's Director of Public Relations, seeking comment on Ray's letter to Dean Minow.  In response, Larimer provided the website with a copy of the January 24, 2011 EEOC determination letter.  Later that day, *Above the Law* posted the January 24th decision in its entirety, along with Ray's letter to Dean Minow.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citation omitted). "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." *Id*. A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995).

DISCUSSION

## Breach of Contract; Breach of the Covenant of Good Faith (Counts I & II)

Ray bases his breach of contract claim on an employee handbook-as-contract theory that is frequently pled in at-will employment discrimination cases. In this regard, Ray points to the manual that Ropes distributes to its incoming associates explaining firm policies and making the customary

7

blandishments about fair treatment and equal opportunity as establishing a binding employment contract. It is "well-settled" in Massachusetts that the terms of a personnel manual may constitute an implied employment contract, thus defeating the presumption that employment is at-will. But this is the case only if the terms of the manual meet the legal requirements for the formation of a unilateral contract. *LeMaitre v. Massachusetts Turnpike Auth.*, 70 Mass. App. Ct. 634, 638 (2007), *aff'd*, 452 Mass. 753 (2008); *see also O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 691 (1996). While there is no "rigid list of [contract] prerequisites," the first question to be asked is whether it would be reasonable for the employee to regard the manual as a "binding commitment, legally enforceable, concerning the terms and conditions of his employment." *O'Brien*, 422 Mass. at 692, 694 (internal quotations and citation omitted); *see also Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 55 (D. Mass. 1996) ("The issue is not whether [plaintiff] believed he was an at-will employee, a legal conclusion, but rather whether he believed the terms of the manual to be binding on him and his employer.")

> The Massachusetts Supreme Judicial Court has held that there is no implied contract based on the terms of a personnel manual where: (1) the employer retained the right to unilaterally modify terms; (2) the terms of the manual were not negotiated; (3) the manual stated that it provided only guidance regarding the employer's policies; (4) no term of employment was specified in the manual; and (5) the employee did not sign the manual to

manifest assent.

*Day v. Staples, Inc.*, 555 F.3d 42, 58-59 (1st Cir. 2009), citing *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 14 (1988).

Having heeded the lesson of *Jackson*, the Ropes handbook made explicit that its terms were non-negotiable, included a disclaimer that it did not constitute a contract, and omitted any term of employment.[5]  It stipulated further that Ropes retained the right to modify its policies or withdraw them all together without notice.   Given these admonitions, Ray (especially considering his training as a lawyer),could not reasonably have regarded the manual as an enforceable employment contract.  *See Day*, 555 F.3d at 59 ("Given these disclaimers, the absence of any negotiation over the terms, and the absence of any specified term of employment, [plaintiff] could not reasonably have believed that the employment manuals he was given constituted the terms or conditions of employment, equally binding on employee and employer."   (internal quotations, citation, and alterations omitted)); *see also Joyce v. McDonald*, 50 Mass. App. Ct. 116, at *1 (2001) (unpublished) (attorney could not have understood disclaimer in employee

---

[5] The forward to the Ropes associate handbook states that "it is only a general guide to Ropes & Gray policies" and that "[n]either these policies nor this manual are intended, nor should they be construed, to give rise to contractual rights or obligations of any kind."

handbook to grant him rights beyond those of an at-will employee).

The covenant of good faith and fair dealing cited by Ray is a creature of contractual law that reflects an implied condition in every contract "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471-472 (1992) (internal quotations and citation omitted). "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in [an] existing contractual relationship . . . ." *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). As here there is no contract, it follows that there can be no claim for a breach of the covenant. Ropes will be granted summary judgment on Ray's contract claims.

## Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2(a); 42 U.S.C. §1981; and Mass. Gen. Laws ch. 151B, § 4(1) (Counts III & VI)

Because Ray has not offered any direct evidence of unlawful discrimination, the *McDonnell Douglas* burden-shifting framework applies to his federal and state discrimination claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001); *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 420 (2003). Ray must first establish a prima facie case giving rise to an inference of

discrimination. *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93 (1st Cir. 2012). To succeed, he must show that: (1) he is a member of a protected class; (2) he was qualified to become a Ropes partner; (3) Ropes refused to promote him; and (4) the position remained open or was filled by a person with similar qualifications. *Kosereis v. Rhode Island*, 331 F.3d 207, 212-213 (1st Cir. 2003). If Ray establishes a prima facie case, the burden shifts to Ropes to articulate a legitimate, nondiscriminatory reason for its decision to terminate Ray. *Id.* at 212. The burden on the employer at this stage is not onerous. "In assessing pretext, a court's 'focus must be on the perception of the decision maker,' that is, whether the employer believed its stated reason to be credible." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (citation omitted). "The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext." *Tardanico v. Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 448 (1996). If the employer passes this test, the plaintiff must come forward with evidence showing that the employer's proffered reason is a pretext and that a discriminatory animus was at the heart of the employer's actions. *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999).

Ropes makes the initial argument that Ray has failed to demonstrate a prima facie case because he has not shown that he was qualified to become a Ropes partner. But, at this preliminary stage, Ray "need not show that []he

was 'qualified' for partnership in the sense that []he was clearly entitled to partnership; rather [Ray] must merely show that '[]he was sufficiently qualified to be among those persons for whom a selection, to some extent discretionary, would be made.'" *Dow v. Donovan*, 150 F. Supp. 2d 249, 262 (D. Mass. 2001), quoting *Fields v. Clark Univ.*, 966 F.2d 49, 53 (1st Cir. 1992). As Ropes admits, a number of partners gave Ray at least partially positive reviews in his three years with the firm and as late as the end of 2007, the Policy Committee still held out the possibility (albeit slim) of a partnership. Given that the prima facie showing is "quite easy to meet," *Mesnick*, 950 F.2d at 823, Ray has satisfied the first step of the burden-shifting framework. *See Masterson v. LaBrum & Doak*, 846 F. Supp. 1224, 1232 (E.D. Pa. 1993) (favorable evaluations from partners sufficient to establish qualification for a partnership).

Ropes's assertion that Ray was not promoted because he was not qualified, supported by reference to written evaluations of Ray's work, is, however, a legitimate, nondiscriminatory reason for his termination. Ropes has thus met its burden of production. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143-144 (2000). Ray, therefore, is obligated to demonstrate that Ropes's proffered reason for declining to advance him towards partnership was not the true reason, but rather a pretext for discrimination. *Id*.

In pursuit of this goal, Ray first contends that the partner evaluations that served as the basis for the Policy Committee's decision not to promote him were tainted with racial bias. According to Ray, his "reviews show he was uniformly viewed by partners as competent, capable, and in command, [and as] possessing strong analytic and writing skills." Pl.'s Opp'n. to Summ. J. at 13. Thus, partners were forced to level their "false, negative criticisms" at more amorphous traits such as collegiality and leadership. *Id*. at 13-14. But a review of the totality of the evaluations over time does not support Ray's flattering self-characterization. In his first review in 2006, it is true that Ray's evaluations were "uniformly strong from every corner," and he was considered "very productive and in demand." In his year-end review, his comments were more mixed, but his performance was still judged to be a "promising start." Ray's 2007 reviews, however, deteriorated markedly: a majority of his evaluations contained at least some negative comments while a few leveled substantial criticisms, leading the Policy Committee to inform Ray that his chances at a partnership were "no better than even" and an "uphill climb." Ray was told that a failure to work more collegially would be a "dealbreaker." Of the partner evaluations that comprised Ray's 2008 review, all but a few were decidedly negative.

While the most consistent criticisms of Ray faulted personal traits such

as a lack of teamwork skills, friction in his interactions with junior associates, and poor task management, Ray's substantive work also came in for criticism. While some partners lauded Ray's analytical and writing abilities, others judged these skills as lacking, or at best, merely adequate. Seen as a three-year whole,  it is not accurate to say that the positive evaluations of Ray's substantive talents significantly outnumbered those expressing reservations, much less that the praise was "uniform."  Overall, Ray's reviews reflected progressively growing criticism – with two partners going so far as to state they would be hesitant to work with him again – while positive reviews were often tempered with reservations.

Against this backdrop, Ray has not come forward with plausible evidence that the partner evaluations or the Policy Committee's decision, consciously or unconsciously, were tinged with or influenced by racial animus.  Ray cites two incidents that purportedly illustrate Ropes's bias against black employees.  In the first, which occurred in early 2008, Robert Skinner, a Ropes partner, asked Ray to serve on a defense team in a prospective case defending a bank accused of discriminatory lending practices involving African Americans. According to Ray, Skinner requested that he stand in as the "token black associate" for the

sales presentation.[6]  Second, Ray recalled that in March of 2008, Bodner told a story that included the N-word.[7]  While these comments are certainly offensive (if made), Ray has not shown that either Skinner's or Bodner's evaluations were racially biased.  Bodner, rather, appears to have been Ray's most enthusiastic supporter, such that Ray requested a letter of recommendation from him in 2009, after Ray alleges that he uttered a racial slur.  Skinner, too, gave Ray a positive review in 2006, and in 2008 wrote only that he had heard rumors about Ray mistreating subordinates, but acknowledged that he had no first-hand knowledge of the matter.

Moreover, Ray offers no explanation as to how these isolated incidents came to infect the evaluations of the nearly twenty partners who criticized his performance to one degree or another, or the decision of the Policy Committee (of which Skinner and Bodner were not members) to deny Ray a promotion nearly a year after the offensive remarks are alleged to have been made.[8]  It is well established in this circuit that "'stray remarks in the workplace . . .,

_____

[6] Skinner testified that this was Ray's phrase, not his.

[7] Bodner does not recall telling the story, and testified that he would never have used the N-word.

[8] Roscoe Trimmier, an African-American partner at Ropes and Ray's department head, wrote in Ray's 2008 review: "[t]ime for an exit message. We stuck with him for a year longer than we should to try to help him . . . but this has gotten worse, not better."

statements by nondecision makers, or statements by decision makers unrelated to the decisional process itself' normally are insufficient to prove [an] employer's discriminatory animus." *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 13 (1st Cir. 1998) (citation omitted); s*ee also Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 125 (1st Cir. 2011) ("Although [stray] remarks may be material to the pretext inquiry, their probativeness is 'circumscribed if they were made in a situation temporally remote from the date of the employment decision in question, or if they were not related to the employment decision or were made by nondecisionmakers.'"), quoting *McMillan v. Mass. Soc'y for Prev. of Cruelty to Animals*, 140 F.3d 288, 301 (1st Cir. 1998).

Ray points to the reviews of nine Ropes associates who were promoted or permitted to remain at Ropes as evidence that similar perceived performance weaknesses did not hinder the careers of other associates. As an initial matter, the nine associates cited by Ray are not relevant comparators and their evaluations are not qualitatively similar.[9]  But even accepting Ray's

---

[9] First, none of the nine associates were in the same practice group as Ray, that is, general litigation. *See Kosereis*, 331 F.3d at 214 (examples of disparate treatment "must closely resemble one another in respect to relevant facts and circumstances"). Second, the reviews of associates promoted to domestic Ropes offices were significantly superior to Ray's, containing only occasional criticism, and including many enthusiastic recommendations for

argument that Ropes applied its partnership criteria unevenly, he still falls short of a showing of discriminatory animus.   Title VII outlaws only employment decisions made for discriminatory reasons, not those resulting from poor business judgment.  As the First Circuit has stated, a court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Espinal v. Nat'l Grid NE Holdings 2, LLC*, 693 F.3d 31, 35 (1st Cir. 2012) (internal quotations and citation omitted).  Rather, its "task is limited to determining whether [Ropes] believed in the accuracy of the reason given" for declining to promote Ray.   *Id*. (internal quotation marks, citation, and alterations omitted).   Because there is no evidence that either the Policy Committee or the substantial majority of partners who authored negative reviews did not believe the performance evaluations to be true, Ray's inconsistency-as-proof-of-discrimination argument fails.

Finally, Ray states that from the firm's founding in 1865 to his

_____

partnership.  Ray, on the other hand, received consistent criticism and, in his 2008 evaluations, not one partner recommended him for promotion.  As to Ray's claim that Ropes's promotion of four Asian associates is evidence that the firm's selection process is infected with racial bias, Ray makes no attempt to explain how race or nationality used positively in the promotions of others is evidence of discrimination against *him*.  Moreover, the evaluations indicate that these associates were promoted in the firm's Tokyo and Hong Kong offices to fill business needs overseas with language skills being most often cited as the cinching criterion.

termination in 2009, only one black associate was ever promoted to partner and none elevated to counsel.[10]  This statistic, combined with a subjective decision-making process, Ray claims, create a material issue of fact as to whether he was the victim of discrimination.  The weaknesses in Ray's statistical argument are readily apparent. Aside from the lack of evidentiary support, *see* fn. 10, *supra,* Ray's statistic omits any information on the number of black associates Ropes hired, the number of black associates considered for promotion, or the relevant data for peer firms in Boston.  At bottom, whether the statistic is true or not, Ray is unable to connect it in any meaningful way to his evaluations or the Policy Committee's decision not to promote him.[11]  *See LeBlanc*, 6 F.3d at 848 ("[S]tastical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate,

---

[10] The only evidence Ray offers to support this statistic is the deposition of Roscoe Trimmier who testified that he was the only black associate promoted to partner from the time he joined the firm in 1983.  Beyond this fact, Ray greatly misstates Trimmier's testimony. While Trimmier testified that he was the only associate promoted to partner during his tenure at the firm, he also testified that Ropes had six African American partners during that time. The EEOC in its decision found that Ray was "the first African American attorney whose partnership candidacy was rejected by the firm."

[11] The EEOC found that during the relevant time period, Ropes offered summer associate positions to a higher percentage of African American law school students who accepted call back interviews than non-African American applicants, and was ranked twelfth on the list of the best national law firms for diversity.

nondiscriminatory rationale for its decision to dismiss an individual employee."). In sum, Ray's bare statistic stands "precariously unsupported by other probative evidence of [race] discrimination," *id.*, and is insufficient to create a material issue of fact for the jury. Ropes's motion to dismiss Ray's federal and state discrimination claims will be allowed.

### Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a); 42 U.S.C. §1981; and Mass. Gen. Laws ch. 151B, § 4(4), 4(4A) (Counts IV & VII)

Title VII "makes it unlawful for an employer to discriminate against any of [its] employees . . . who have [ ] availed themselves of Title VII's protections . . . ." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997) (internal quotations omitted), quoting 42 U.S.C. § 2000e-3(a). The term "employees" includes former employees, such as Ray. *Id.* at 345. In the absence of direct evidence, retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* burden-shifting framework. *Roman v. Potter*, 604 F.3d 34, 49 (1st Cir. 2010).[12] To make out a prima facie case of retaliation, Ray must show that: (1) he engaged in protected conduct under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally connected to the

---

[12] Like discrimination claims, the framework also applies to retaliation claims under 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 151B, § 4(4). *Oliver* 846 F.2d at 111; *Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005).

protected activity.  *Hernandez-Torres v. Intercont'l. Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998).  A plaintiff attempting to establish a retaliation claim must ultimately show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013).

Employee conduct is protected under the anti-retaliation provision of Title VII if the employee "has opposed any practice made an unlawful employment practice" by Title VII (opposition clause) or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII (participation clause).  42 U.S.C. § 2000e-3(a).  Under the opposition clause, an employee who opposes employment discrimination "need not prove that the conditions against which he protested actually amounted to a violation of Title VII," but must demonstrate that he held a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law."  *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009).  However, an employee asserting a retaliation claim based on participation activity is not required to show a reasonable basis for engaging in the activity.[13]  *See Wyatt v. City of Boston*, 35

---

[13] The parties vigorously dispute whether the participation activity prong also incorporates an element of "reasonable belief."  Ropes contrasts *Wyatt*

F.3d 13, 15 (1st Cir. 1994) ("As for the participation clause, there is nothing in its wording requiring that the charges be valid, *nor even an implied requirement that they be reasonable.*" (emphasis added, internal quotations and citation omitted)).

Ray advances three claims of unlawful retaliation.[14] First, he alleges that

---

with *Fantini*, in which the First Circuit omitted any distinction between the opposition and participation clauses, stating that activity is protected under Title VII – whether opposing illegal practices or participating in a Title VII proceeding – only if the employee can demonstrate that he reasonably believed that his employer's actions amounted to discrimination. *See Fantini*, 557 F.3d at 32. I will follow *Wyatt* for two reasons. First, *Wyatt* directly addressed whether protected participation activity must be based on a reasonable belief that an employer committed unlawful discrimination and concluded that it does not. Second, *Fantini* involved only opposition activity and thus its more general formulation of the law was not concerned with participation conduct, the issue here. Finally, a finding that the participation clause does not incorporate a reasonableness test is in line with the decisions of the majority of courts that have considered the issue. *See Booth v. Pasco Cnty., Fla.*, 829 F. Supp. 2d 1180, 1201 (M.D. Fla. 2011) (citing cases).

[14] Ray's motion for summary judgment on his retaliation claims is based solely on interference with prospective employment opportunities after the filing his EEOC charge. In his opposition to Ropes's motion for summary judgment, however, Ray also argues that he was denied a promotion in retaliation for reporting incidents of discrimination to the firm. To the extent Ray's retaliation claims are premised on not advancing towards partnership, he is unable to demonstrate that the Policy Committee's decision was pretextual for the reasons discussed earlier. Ray's subsidiary claim that the firm withheld assignments from him after his complaints of discrimination (thus damaging his chances for partnership) is unsupported by the evidence. Assuming that Ray reported the alleged incidents (which Ropes denies), his billable hours in 2008 do not reflect a material deviation from the previous year.

Ropes refused to provide him with letters of recommendation and locked him out of his office after he filed his discrimination complaint with the EEOC. Filing a charge with the EEOC is a protected activity under Title VII. *Hochstadt v. Worcester Found.*, 545 F.2d 222, 231-232 (1st Cir. 1976). Refusing to provide a recommendation is an adverse employment action. *See* EEOC Compliance Manual §8-II(D)(2) ("Examples of post-employment retaliation include actions that are designed to interfere with the individual's prospects for employment such as . . . refusing to provide a job reference, and informing an individual's prospective employer about the individual's protected activity . . . ."). However, because Ray had already entered his severance period and retained all benefits of employment up to his stated termination date – including full salary and benefits and use of his firm email address – eviction from his office was not an adverse employment action. *See Connell v. Bank of Boston*, 924 F.2d 1169, 1179 (1st Cir. 1991) (where the termination date is already "irrevocably decided," but employment is still paid in full, removing an employee from his office is not deemed an adverse action).

With respect to the letters of recommendation, Ropes argues that Bodner's refusal to advocate for Ray was not retaliatory because Bodner believed that Ray's discrimination allegations were scurrilous and that as a

result he could no longer provide a positive reference "in good conscience."[15] Given the timing of the refusal and Bodner's previously positive remarks about Ray's performance, a jury could find that this explanation is pretextual. Similarly, a jury could find that O'Connor's failure to respond to Ray's follow-up inquiry was motivated by retaliation for filing his complaint. Accordingly, Ray's claim that Ropes withheld his recommendation letters in retaliation for filing an EEOC charge will be reserved for the jury to decide at trial.

Ray's third claim of retaliation is based on Ropes's providing of the EEOC's initial no cause determination letter – which included details about Ray's performance reviews and an internal investigation into alleged criminal conduct on Ray's part – to *Above the Law* one day after Ray wrote to the Dean of Harvard Law School urging that Ropes be banned from on-campus recruiting.[16]  Ropes offers two related arguments as to why its distribution of

---

[15] Ropes does not offer an explanation for O'Connor's failure to respond.

[16]  Ropes moves for summary judgment on the ground that Ray's Amended Complaint did not claim that Ropes's release of the EEOC's no-cause determination was retaliatory.  The parties, however, conducted extensive discovery on the *Above the Law* issue and Ray added counts of defamation and invasion of privacy based solely on the basis of this disclosure.  While Ray did not amend his initial counts of retaliation to include this incident, his defamation claim alleged that Ropes released the EEOC determination to impugn his character and reputation.  Because Ray's retaliation claim arises from the same set of facts as others detailed in his Amended Complaint, I find that Ropes received sufficient notice of the claim.

the EEOC's determination to a legal news site was not retaliatory.[17]   First, Ropes contends that the determination letter was not confidential and, because it was Ray who initially disseminated the EEOC's retaliation finding, it was entitled to correct his one-sided presentation of the facts.   Second, Ropes claims that it only provided the documents in direct response to *Above the Law*'s inquiry after the website obtained Ray's letter to Dean Minow and notified Ropes that it planned to publish it.

Although an EEOC determination of a charge by a private sector employee is not a "decision" of public record, there is nothing prohibiting either the charging party or the respondent from publicizing the determination. *See* 29 C.F.R. § 1601.22 (confidentiality restrictions apply only to the EEOC); *Walker v. Braes Feed Ingredients, Inc.*, 2003 WL 1956162, at *16-17 (N.D. Ill. Apr. 23, 2003) (same).   However, insofar as Ropes claims that it was free to disseminate the determination letter containing sensitive information about Ray because it was "not private," the argument proves too much. Even in the absence of any non-disclosure obligation, Title VII prohibits

---

[17] It is clear that writing a letter to protest perceived discriminatory practices is protected conduct under Title VII. *See Pearson v. Mass. Bay Transp. Auth.*, 2013 WL 3507785, at *5 (1st Cir. July 15, 2013). Ropes argues, however, that Ray's letter to Dean Minow was not a genuine protest letter, but was merely a ploy to  extract a larger settlement from the firm. The dispute as to Ray's intent is a matter for the jury to decide.

an employer from responding to protected activity by taking an action that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotations and citation omitted). The threat of dissemination of derogatory private information, even if true, would likely deter any reasonable employee from pursuing a complaint against his employer.

While there may be force to Ropes's second argument that it provided the EEOC determination letter to *Above the Law* to "ensure an accurate picture of the EEOC proceedings,"  in doing so, Ropes knowingly released severely damaging information about Ray – including an allegation of criminal misconduct – and arguably violated its own policy against disseminating information contained in employee personnel records.  It is open to a jury to find that Ropes would not have responded to *Above the Law* in the way it did but for Ray's protest letter to Dean Minow.  Consequently, both parties' motions for summary judgment as to Ray's retaliation claims will be denied.

**Discrimination in Violation of Mass. Gen. Laws ch. 93, § 102 (Count V)**

Ray also brings an unlawful discrimination claim under the

Massachusetts Equal Rights Act (MERA).[18] This claim, however, is preempted by Mass. Gen. Laws ch. 151B.  "Chapter 151B provides the exclusive statutory scheme for resolving employment discrimination claims under Massachusetts law." *Flipp v. Town of Rockland*, 613 F. Supp. 2d 141, 146 (D. Mass. 2009). Thus, where chapter 151B is applicable, a plaintiff may not pursue a claim under MERA.  *See e.g.*, *Edsall v. Assumption Coll.*, 367 F. Supp. 2d 72, 81 (D. Mass. 2005) ("Chapter 151B, where it can be invoked, preempts a claim under MERA."); *Lopez v. Com.*, 463 Mass. 696, 715 (2012) ("Where remedies under G.L. c. 151B are or were available to a complainant, those remedies are exclusive, preempting the joining of parallel MERA claims." (internal quotations and citation omitted)).    Because Ray may bring his state discrimination and retaliation claims under chapter 151B (and has done so), Ropes's motion for summary judgment as to Ray's discrimination claim under section 102 will be allowed.

### Unfair Competition in Violation of Mass. Gen. Laws ch. 93A, § 11 (Count VIII)

The Massachusetts Unfair Trade Practices statute "governs commercial transactions between two parties acting in a business context." *Kraft Power*

---

[18] MERA provides a private right of action for individuals within the Commonwealth who believe that they have been discriminated against on the basis of "sex, race, color, creed or national origin."

*Corp. v. Merrill*, 464 Mass. 145, 155 (2013) (internal quotations and citation omitted). The statute, however, "does not provide a remedy for disputes arising out of an employer-employee relationship." *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 719 (2011). Thus, insofar as Ray's section 11 claim is predicated on acts committed during his employment – such as being evicted from his office and denied letters of recommendation – it is foreclosed by the employee exception.

But Ray also argues that Ropes "made knowingly false and misleading statements regarding [ ] his performance and character, in order to preclude him from competing legal employment or providing competing legal services." Pl.'s Opp'n. to Summ. J. at 25. Ray, however, provides no evidence in support of this assertion. Ray claims that Ropes's refusal to provide letters of reference prevented him from gaining academic employment with Penn State and government employment as an Assistant United States Attorney. As a private law firm, Ropes is not in competition with either academic institutions or the executive branch of the United States government for clients. While Ray speculates that he could have walked through the revolving door of government employment to later obtain a lucrative position at a private firm, this hypothesized chain of events falls far short of chapter 93A's causation requirement. *See Farm Bureau Fed'n. Inc. v. Blue Cross of Massachusetts,*

27

*Inc.*, 403 Mass. 722, 730 (1989) (A deceptive act must be a proximate cause of a loss to the plaintiff to sustain a complaint under section 11).

Ray further alleges that he applied to positions at peer firms but was rejected because of Ropes's alleged interference.  Although Ray did inquire about positions at two private law firms, he did so *before* he filed his EEOC complaint.  Ray was passed over for a position at both firms because they were not then hiring; he was never asked to provide recommendations from Ropes.[19]  Finally, while Ray cites a single purported example of a client initially refusing to hire him after he started his own firm because of Ropes's "false statements," he provides no details of this alleged incident.[20]  Ropes's motion for summary judgment as to Ray's unfair competition claim will be granted.

**Defamation (Count IX)**

In a final claim, Ray alleges that  he was defamed by Joy Curtis, the chief administrator of Ropes's human resources department.  According to the Complaint, Curtis published false statements about Ray that were damaging

---

[19] Contrary to Ray's claim, the evidence shows that shortly after Ray learned that he would not be promoted, Bodner enthusiastically recommended him to the Boston office of the law firm Skadden, Arps, Slate, Meagher & Flom LLP.

[20]  To the extent Ray implies that Ropes prevented him from securing work as a lawyer at all, this claim is belied by his employment at Kachroo Legal Services, P.C., before starting his own practice.

to his reputation in the community. *See White v. Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66 (2004). The reference is to a reprimand issued to Ray as the result of an internal investigation of an alleged personal indiscretion on Ray's part. Putting aside the issue of falsity (which Ropes vigorously contests), the claim is barred under Massachusetts law by the conditional privilege extended to a supervisor, executive or corporate officer to publish defamatory material concerning an employee that "is reasonably related to the employer's legitimate business interest" of which the evaluation of an employee's job performance and conduct is one. *See Sklar v. Beth Israel Deaconess Med. Ctr.*, 59 Mass. App. Ct. 550, 558 (2003), citing *Foley v. Polaroid Corp.*, 400 Mass. 82, 95 (1987). This privilege is lost to the employer only if the supervisor responsible for the publication "(1) knew the information was false, (2) had no reason to believe it to be true, or (3) recklessly published the information unnecessarily, unreasonably or excessively." *Id.* Without exception, whether the privilege attaches or not will be decided by the court as a matter of law. *See Howell v. The Enterp. Pub. Co., L.L.C.*, 455 Mass. 641, 661 (2010). Here, there is no doubt that Curtis, as the head of human resources, was acting within the scope of the privilege when she provided copies of the reprimand – which was based on statements of witnesses and Ray's own version of events – to only three individuals within the firm with a legitimate

29

interest in the reprimand: Diane Patrick, the chair of the Diversity Committee that investigated Ray's discrimination complaint; Rob Jones, Ray's assistant department head and supervisor; and Ray himself.  Summary judgment will be granted to Curtis on the defamation claim.

ORDER

Ropes's motion for summary judgment on Counts I, II, III, V, VI, VIII, and IX is <u>ALLOWED</u>.  Ropes's motion for summary judgment on Counts IV and VII is <u>DENIED</u>.  Ray's motion for summary judgment on Counts IV and VII is also <u>DENIED</u>.  The case is set for a trial by jury on November 12, 2013, on Counts IV and VII, limited to the issue of whether Ropes retaliated against Ray when it failed to produce promised letters of recommendation and disseminated the January 24, 2011, EEOC determination to *Above the Law*.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE